523 So.2d 1370 (1988)
Dr. W.B. LANDRY, et al.
v.
Charest THIBAUT, Jr., et al.
No. 87-CA-309.
Court of Appeal of Louisiana, Fifth Circuit.
April 6, 1988.
Writs Denied June 3, 1988.
*1371 Sessions, Fishman, Rosenson, Boisfontaine, Nathan & Winn, Robert E. Winn, Jerome K. Lipsich, Joy G. Braun, New Orleans, for plaintiffs/appellees.
Cleveland, Barrios, Kingsdorf and Casteix, Carl W. Cleveland, Bruce S. Kingsdorf, *1372 New Orleans, for defendants/appellants.
Before CHEHARDY, GRISBAUM and GOTHARD, JJ.
GOTHARD, Judge.
This case originated with the sale of large blocks of St. Charles Bank and Trust Company stock to each of the three plaintiffs and other investors, including some of the defendants. Later, examinations by federal and state regulatory authorities revealed inadequacies and deficiencies in the bank's financial structure. The value of the bank's stock dropped drastically in less than two years, causing the three plaintiffs to seek legal counsel and eventually to file suits in both state court and federal court. The appeal before us is from judgment awarding damages to the plaintiffs under two Louisiana statutes, LSA-R.S. 12:91, concerning the fiduciary duty of a corporate officer, and the Louisiana Blue Sky Law, R.S. 51:715.
The parties before this court are the plaintiffs-appellees, Dr. W.B. Landry, Bryan Zeringue, and Curtis Chauvin, purchasers of stock, and the defendant-appellant, Charest Thibaut, Chairman of the Board. The stock purchases were made in the summer of 1974, for $60 per share. After the regulatory examinations and the determination that the Bank was undercapitalized, in January, 1976 the Bank issued a proxy statement disclosing its precarious financial position and announcing a stock offering at $4 per share. The plaintiffs filed suit in the 29th Judicial District against Thibaut and eighteen other defendants on December 6, 1976. The federal suit was filed on January 26, 1977 in the District Court for the Eastern District of Louisiana against Thibaut and others. The record of the ten-year litigation is replete with allegations of mismanagement, fiduciary irresponsibility, and self-dealing on the part of those in control of the bank, which resulted in a decline in the value of the stock, with counter charges of scapegoating and misplaced blame for problems caused by a slow economy.
PROCEDURAL HISTORY
Federal suit. The plaintiffs elected to pursue the federal suit first, letting the state suit remain inactive. In their first complaint, filed January 26, 1977, they alleged violations of Sec. 10(b) of the Security Exchange Act of 1934 and Rule 10b-5 by All American Assurance Company, Republic Securities Corporation,[1] Thibaut, Remy F. Gross, and C. Therral Ransome. On January 29, 1979, the plaintiffs filed an amended complaint to add as defendants the Bank, Royal American Corporation, Henry Friloux, and Alcide J. Laurent. The causes of action were broadened to include claims under Sec. 17(a) of the Securities Act of 1933, LSA-R.S. 12:91, and LSA-R.S. 51:701 et seq., the Louisiana Blue Sky Law. Prior to trial the court dismissed the claims under Sec. 17(a) of the Securities Act of 1933 and LSA-R.S. 12:91 on grounds that there was no private cause of action under either statute; that court also dismissed the Louisiana Blue Sky claim on grounds that the cause had perempted. At trial the court found that the Bank, Friloux, and Laurent had violated Sec. 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 but the plaintiffs could not recover because of their failure to exercise due diligence in buying the stock. (The opinion was not published.)
Upon appeal, in Landry v. All American Assur. Co., 688 F.2d 381 (5 Cir.1982), the Fifth Circuit affirmed the trial court's dismissal of the complaints under Sec. 17(a) of the Federal Securities Act of 1933 and under LSA-R.S. 12:91, but reversed the dismissal of the Blue Sky complaint. Holding that the two-year limitation for suit under the statute was one of prescription rather than peremption, it remanded to the district court for it to determine whether to decide the Blue Sky claim or to relegate the parties to the Louisiana State courts. The *1373 appellate court also affirmed the trial court's judgment as to the claim under Sec. 10(b) of the Securities and Exchange Act of 1934. On November 30, 1982 the federal district court ordered that the state law claim (the Blue Sky claim) be relegated to the state courts, as all other matters before the federal court had been resolved.
State Suit. The original petition, filed December 6, 1976 by Landry, Zeringue, and Chauvin, named as defendants Thibaut, and eighteen other defendants alleged to be members of the board of directors, of whom several were officers and/or members of the executive committee.[2] The plaintiffs sought damages in the amount of the difference between the purchase price they paid for the bank stock in 1973 and 1974 and the diminished or actual value of their shares at time of trial or of an earlier disposition, plus any expenses such as interest on loans for their purchase, and also legal interest from date of demand and attorney's fees. The petition alleged breach of fiduciary duty, in causing or failing to prevent the waste of corporate assets, by mismanaging the Bank's business and other acts or omissions, directly damaging the plaintiffs as shareholders. The petition detailed unsound loans, including several to insiders, granted in 1974 and 1975, overline loans (exceeding the Bank's legal limit) in 1973 and 1974, and loans not properly reviewed or approved by the executive committee in 1973, 1974, and 1975. Because of these practices and the lost earnings which resulted, the stock held by the plaintiffs diminished drastically in value.
As noted above, the federal case was litigated in the intervening years and judgment of the U.S. Fifth Circuit became definitive on November 19, 1982. Following the order of the federal district court relegating the state claim to state courts on November 30, 1982, the plaintiffs filed an amending petition in the 29th Judicial District Court for the Parish of St. Charles on March 7, 1983, more than six years after the original petition was filed. The amending petition added as defendants the Bank, Republic Securities Corporation, and All American Assurance Company. It added a claim under LSA-R.S. 51:715, the Blue Sky Law, alleging that the defendants were persons who directly or indirectly offered, sold, or in some way had a part in the sale of Bank shares to plaintiffs, omitted certain material disclosures, made untrue statements of material fact, and "knew or should have known of the alleged untruths and/or omissions." The second amending petition, filed March 21, 1983 reiterated the allegations of violating the Blue Sky Law but dropped all but Republic, All American, Thibaut, Friloux and Laurent as defendants on the claim under LSA-R.S. 51:715.
Several important judgments were rendered on motions prior to trial: (1) On June 19, 1985 twelve defendants were dismissed on summary judgment as to claims under LSA-R.S. 12:91 because under the facts the "plaintiffs do not have a personal right of action against the directors and officers under 12:91, that their remedy is by means of a stockholder's derivative suit." Defendants Friloux, Laurent and Ransome were also dismissed as to 12:91 claims "on the basis of the law of the case and res judicata, since these same claims were previously decided adversely to plaintiffs in the federal Landry suit...." (2) On August 27, 1985, motions for summary judgment seeking to dismiss the 12:91 claims against Thibaut and Republic were denied, the judge ruling that, "there is a question of the use or misuse of certain insider information by said parties and as such plaintiffs may have a personal right of action against Charest Thibaut, Jr. and Republic Securities Corporation pursuant to *1374 Louisiana R.S. 12:91." (3) In the same hearing the court denied motions for dismissal of Blue Sky claims against Friloux and Laurent on prescription, ruling that adequate notice had been provided by the original petition and the amending petition related back. (4) Finally, on May 1, 1986, the plaintiffs having moved to sever the jury trial of Thibaut and Republic from trial of the remaining defendants (Friloux and Laurent) who elected to have claims against them tried by a judge, the trial court ordered severance of the trial against Thibaut on grounds that it would shorten the trial, obviate confusion of the jury, and "possibly obviate the need for trying the plaintiffs' claims against the other defendants,..."
After a five-day trial on the issue of liability only, the jury found in favor of the three plaintiffs on both their claims against Charest Thibaut, Jr. It denied recovery to Dr. W.B. Landry on the Blue Sky claim, finding that he was contributorily negligent in purchasing the stock. On the LSA-R.S. 12:91 claim the jury found that Thibaut breached his fiduciary duty to the plaintiffs and that the breach caused a loss to the plaintiffs. The trial judge later granted Landry's motion for judgment notwithstanding the verdict as to the finding of contributory negligence.
In assessing damages, the court first listed separately its findings of the proper measures of damages for each of the plaintiffs under the Blue Sky law claims and under the breach of fiduciary duty claims. In rendering judgment the court awarded each plaintiff the amounts listed as appropriate under the LSA-R.S. 12:91 claims: the principal amount of $81,000 and interest of $68,040, plus 12% annual interest on the principal from November 13, 1986 (date of the hearing on quantum) until paid, pending tender of their shares of bank stock to Thibaut. The court awarded in addition total attorney's fees of $150,000, deemed proper under the Blue Sky law claims, with legal interest of 12% per annum from November 13, 1986 until paid, plus costs. This appeal followed.
The appellant raises as issues:
1) whether the R.S. 12:91 claim should have been dismissed on res judicata or law of the case;
2) whether the plaintiffs had a right of action under R.S. 12:91 under the facts as alleged;
3) (a) if the R.S. 12:91 claim should have been dismissed before trial, whether the appellant should be granted a new trial of the Blue Sky claim because evidence of loan transactions occurring after the stock purchases tainted the record; or (b) whether this court should evaluate only the evidence relevant to the Blue Sky claims; and (c) whether the plaintiffs sustained their burden of proof as to the Blue Sky claims and whether Thibaut sustained his burden of proof that he did not know and could not know of the untruths or omissions;
4) whether the court erred in denying Thibaut's exception of prescription as to the Blue Sky Law claim;
5) whether severance of claims against Thibaut from claims against other defendants was correct;
6) whether the court correctly granted Dr. Landry's motion for JNOV, and
7) whether the court's award of damages, interest, and attorney's fees was correct.
Res Judicata Effect Of Federal Decision on LSA-R.S. 12:91 Claim
As noted above, the U.S. Fifth Circuit Court of Appeals affirmed the district court's dismissal of the plaintiff's state claim against Thibaut and others for breach of fiduciary duty. The district court had held that a private cause of action is not available under LSA-R.S. 12:91 and that an action against an officer for breach of duty is secondary and must be asserted through a shareholder's derivative suit.
Thibaut takes the position that the federal court's dismissal of the claim bars litigation in the state court under res judicata or law of the case. The plaintiffs-appellees argue that res judicata does not apply because the claim was not actually litigated in the prior suit and is therefore not a "thing adjudged."
*1375 The principle of res judicata is set out in LSA-R.S. 13:4231 (formerly LSA-C.C. 2286), as follows:
The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality.
In Welch v. Crown Zellerbach Corp., 359 So.2d 154 (La.1978) the court explained, at 156:
As a result of our civilian heritage, res judicata under Louisiana law is perceived to be much narrower in scope than its counterpart in common law jurisdictions. See 51 Tul.L.Rev. 611 (1977); Maloney, Preclusion Devices in Louisiana; Collateral Estoppel, 35 La.L.Rev. 158 (1974). Louisiana legislative authority for res judicata establishes a presumption of correctness and precludes relitigation of the object of the judgment only when there is (1) an identity of the parties, (2) an identity of "cause" and (3) an identity of the thing demanded. C.C. 2285-2287, 3556(31); Mitchell v. Bertolla, 340 So.2d 287 (La.1976); Sliman v. McBee, 311 So. 2d 248 (La.1975); Scurlock Oil Co. v. Getty Oil Co., 294 So.2d 810 (La.1974). The absence of any of these identities is fatal to a plea of res judicata.
In McKean v. Campbell, 372 So.2d 652 (La.App. 1st Cir.1979), where a federal suit had been concluded prior to trial of the state suit, the court said, at 654:
... A final judgment has the authority of res judicata only to those issues presented in the pleadings and conclusively adjudicated by the court, and where any doubt exists the second suit will be maintained. McNeal v. State Farm Mutual Automobile Ins. Co., 278 So.2d 108 (La.1973), Olsen Engineering Corp. v. Hudson Engineering Corp., 289 So.2d 346 (La.App. 1st Cir.1973) writ denied 293 So.2d 170 (La.1974).
See also McCoy v. Tangipahoa Parish School Board, 308 So.2d 382 (La.App. 1st Cir.1975), writ refused 310 So.2d 856 (La. 1975) and Wilson v. H.J. Wilson Co., Inc., 492 So.2d 54 (La.App. 1st Cir.1986), writs denied 496 So.2d 355 (La.1986). In our case the dismissal of the claim under LSA-R.S. 12:91 in federal district court was in response to the defendants' motion to dismiss. Although we are not furnished a copy of the district court's unpublished judgment (except for the portion quoted in the U.S. Fifth Circuit opinion) or a transcript of the hearing of the motion to dismiss, it is apparent that that court ruled upon the plaintiffs' right of action, not the merits of their claim. In two cases involving only state suits, La. Weekly Pub. v. First Nat. Bank of Commerce, 455 So.2d 1295 (La.App. 4th Cir.1984) and Chalmette General Hospital, Inc. v. Cherry, 398 So. 2d 599 (La.App. 1st Cir.1981) writ denied 400 So.2d 211 (La.1981), the prior suits had been dismissed on exceptions of no right of action and were held not to have res judicata effect. We are persuaded that the principles set out in the jurisprudence cited above apply to the facts before us and we affirm the finding of the court below, that the decision of the federal court had no res judicata effect as to the claim under LSA-R.S. 12:91.
We find no merit in the appellant's alternate argument, that the claim should be dismissed because the federal judgment is the law of the case between the parties. Although he acknowledges that that doctrine relates only to the binding force of trial rulings in the same litigation, he insists that the state proceeding in our case is "the trial on remand" of a claim in the federal suit. We disagree. The U.S. Fifth Circuit remanded to the federal district court to decide whether to hear and rule upon the pendent state claim, but the ensuing order of the federal district court is clearly not a remand but an abstention in favor of the state courts.[3] We note also *1376 that the Supreme Court held that, "Law of the case or issue preclusion is not a valid defense in Louisiana...." Safeco Ins. Co. of America v. Palermo, 436 So.2d 536 (La. 1983), at 538. Plaintiff's Claim for Breach of Fiduciary Duty under R.S. 12:91.
Having determined that neither res judicata nor law of the case is applicable to the claim for breach of fiduciary duty and that the trial judge was correct in referring the matter to the merits, we consider the appellant's argument that the plaintiffs do not have a right of action against him for breach of fiduciary duty. LSA-R.S. 12:91 reads as follows, in pertinent part:
Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions....
Thibaut points out that the allegations of the plaintiffs are limited to the diminution in value of their stocks, because of imprudent loans. He argues that the allegations refer to damage to the Bank, not its shareholders, and should be brought in a stockholders' derivative action.
The appellees' position is that the statute, as amended in 1968, expressly provides a right of action for shareholders to recover against officers and directors for losses incurred from their ownership of stock. They argue that these particular plaintiffs and others who purchased stock in the sales of 1974 form a distinct group because they purchased the stock at $60 per share, unlike shareholders who purchased at a lower price earlier or later than the plaintiffs did. The appellees rely heavily on the case of Wilson v. H.J. Wilson Co., Inc., 430 So.2d 1227 (La.App. 1st Cir.1983) writ denied 437 So.2d 1166 (La.1983), for the principle that a shareholder may sue individually to recover a personal loss. A minority shareholder in a small family-owned business sued the corporation and his brother, who was founder, principal shareholder, and overall operator of the business. The plaintiff alleged that a stock-for-stock agreement had been breached, reducing his ownership in the company, and sought to recover the shares of stock, which had been fraudulently transferred to the brother on the corporation's books. The court held that where a breach of fiduciary duty causes loss to a shareholder personally, the shareholder may sue individually to recover his loss.[4] The reasoning of the Wilson case was followed in Succession of Davis, 463 So.2d 723 (La. App. 4th Cir.1985). There a shareholder sued the succession of a corporate president, alleging fraud and misrepresentation in connection with a stock redemption agreement, and the court recognized the plaintiff's suit as a claim under LSA-RS. 12:91.
Before the Wilson case, supra, in Noe v. Roussel, 310 So.2d 806 (La.1975) and Levy v. Billeau, 443 So.2d 539 (La.1983), Louisiana courts recognized the right of a shareholder to sue individually for breach of fiduciary duty in liquidation proceedings, where the fiduciary duty of a corporate officer or director was vested in the liquidator. In the Noe case the plaintiff's stock was allegedly fraudulently manipulated and he was deprived of his rightful share of the corporation's liquidated assets, while in the Levy case the alleged breach was implementing a liquidation plan that was unduly oppressive of the minority shareholder.
The general rule is that the right to an action against officers and directors for *1377 mismanagement or fraud that causes loss to the corporation is an asset of the corporation and may only be asserted secondarily by a shareholder through a shareholder's derivative suit. This rule was followed in Beyer v. F & R Oilfield Contractors, Inc., 407 So.2d 15 (La.App. 3rd Cir.1981), writ denied 411 So.2d 451 (La.1982), where the minority shareholders attempted to sue the corporation and its directors and officers for damages suffered from the defendants' illegal and ultravires acts, such as paying excessive salaries to themselves. See also Ware & Wingate Co. Inc. v. Wingate, 495 So.2d 1334 (La.App. 3rd Cir.1986); Normat Industries, Inc. v. Carter, 477 So.2d 783 (La.App. 5th Cir.1985); Moity v. Acadian Woodworks, Inc., 435 So.2d 597 (La.App. 3rd Cir.1983).
The evidence brought out at trial is conclusive that Thibaut failed to fulfill his fiduciary duty to the bank and its shareholders. He allowed unsafe banking practices to be followed by the managers, particularly in the review and granting of loans, many of which were later "classified" by bank examiners. However, after reviewing the evidence presented at trial, we are convinced that the damage was wrought to the corporation and only indirectly to the shareholders, as reflected in the decline of value of their stock. The mismanagement did not personally or directly affect the group of investors who purchased their stock in 1974; all shareholders except those purchasing at par in 1976 experienced a drop in value of their holdings. The plaintiffs were not singled out for unfair treatment in stock transfers or redemptions as were the plaintiffs in Wilson v. H.J. Wilson Co., Inc., supra, Succession of Davis, supra, Noe v. Roussel, supra, and Levy v. Billeau, supra.
For the reasons discussed above, we conclude that the trial court's ruling on the breach of fiduciary duty claim was in error and that under the facts brought out at trial it is clear that the claim should properly be asserted in a shareholders' derivative suit.
Prescription of Blue Sky Claim:
The issue raised by the defendant is stated in the alternative: (a) whether the time limitation in LSA-R.S. 51:715 is one of peremption rather than prescription, or (b) whether the plaintiffs' claim prescribed because the amended petition, in which they raised the Blue Sky claim, did not relate back to the original petition so as to interrupt prescription.
(a) If the limitation in the Blue Sky Law of two years from the sale of securities is peremptive, which does not permit interruption or suspension of the limitation, rather than prescriptive, which does, then the plaintiffs' claim was barred, the sale having taken place in May and July, 1974 and the suit having been filed on December 6, 1976, more than two years later.
The defendant relies upon the case of Guillory v. Avoyelles Railway Co., 104 La. 11, 28 So. 899 (1901), in which the court explained, at 901:
... When a statute creates a right of action, and stipulates the delay within which that right is to be executed, the delay thus fixed is not, properly speaking, one of prescription, but it is one of peremption. Statutes of prescription simply bar the remedy. Statutes of peremption destroy the cause of action itself. That is to say, after the limit of time expires the cause of action no longer exists; it is lost....
We note, however, that the Guillory court also stressed a public policy reason for having a peremptive limitation in that statute, that actions challenging the tax would be filed before large sums of money were spent. In Pounds v. Schori, 377 So.2d 1195 (La.1980) the court considered whether the time limit for filing a disavowal action under the law in effect in 1976, before amendment, was peremptive or prescriptive. That court held the limitation to be peremptive and explained its reasoning, at 1199-1200:
We agree [with Baudry-Lacantinerie and Tissier] that each case of this nature should be considered separately on its merits, bearing in mind that the main consideration is the purpose sought to be *1378 achieved by the particular limitation period involved.
... Our jurisprudence reflects unwavering dedication to the rule of strict construction of the articles governing disavowal actions. The fundamental end achieved thereby is, of course, preservation of the family unit, the foundation of our society. Further considerations are the stigma of illegitimacy and resultant disinherison attendance upon a successful disavowal action.
See also Guidry v. Theriot, 377 So.2d 319 (La.1979). In determining that a time limitation on medical malpractice actions, LSA-R.S. 9:5628, is prescriptive rather than peremptive, the court said, in Hebert v. Doctors Memorial Hosp., 486 So.2d 717 (La. 1986) at 722:
... [A] characteristic of a statutorily created peremptive period is the existence of an underlying public interest that a right exist only for a limited period of time....
The jurisprudence on peremption was codified in 1982, in LSA-C.C. art. 3458-61. Comment (c) under article 3458 affirms the principles of case by case analysis and consideration of the purpose of the act:
It is not always easy to determine whether a period of time fixed by law is peremptive or prescriptive. The determination must be made in each case in the light of the purpose of the rule in question and in light of whether the intent behind the rule is to bar action or to limit the duration of a right. For a discussion of this subject, see Comment, Legal Rights and the Passage of Time, 41 La.L. Rev. 220, 252 (1980).
The Fifth Circuit in Landry v. All American Assur. Co., supra, ruled that the underlying purpose of R.S. 51:715 is to promote full and accurate disclosure of information in connection with the sale of stock. The period of limitations is prescriptive; a finding of peremption, "... would only serve to reward those who must skillfully cloak their misrepresentations and omissions...." We agree with the federal appellate decision and hold that the two-year limitations period in R.S. 51:715 is one of prescription. Accordingly, prescription did not begin running until January, 1976 when the plaintiffs received the proxy statement detailing the bank's problems, and was interrupted by the December 6, 1976 filing.
(b) The defendant argues, alternatively, that the Blue Sky claim had prescribed, even if this court determined the limitation is prescriptive. He points out that it was not until January 25, 1979 that the plaintiff asserted the claim in the federal court and March 7, 1983 in the state court. He complains that the original state court petition gave no notice of the facts asserted in the Blue Sky claim; consequently, the amended petition asserting the R.S. 51:715 claim cannot relate back to the date of filing the original petition and does not interrupt prescription. La.C.C.P. art. 1153 provides that:
When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing the original pleading.
In Gunter v. Plauche, 439 So.2d 437 (La. 1983), the Supreme Court set out the requirements for relating back, at 440:
It is well established that art. 1153 permits amendment despite technical prescriptive bars where the original pleading gives fair notice of the general fact situation out of which the amended claim arises. Baker v. Payne and Keller of Louisiana, Inc. 390 So.2d 1272 (La.1980). "Where there is some factual connexity between the original and amended assertions, together with some identity of interest between the original and the supplemental party, amendment should be allowed." Baker, 390 So.2d at 1275.
The plaintiffs' original petition alleged that Thibaut and others owed them damages arising from the sale in 1974 of stock in a bank that was unsound and which stock became virtually worthless. In the amending petition they sought to recover upon a different theory but the source of damages was the same set of facts. The *1379 trial judge, in denying summary judgment to defendants Friloux and Laurent on prescription of the Blue Sky claim ruled that:
. . . . .
... the suit originally filed in the 29th Judicial District Court in December of 1976 was sufficient to put defendants Henry J. Friloux, Sr. and Alcide Laurent on notice of a factual situation giving rise to a claim for damages by plaintiffs herein (sale of stock in the Bank of St. Charles to plaintiffs) and as such there was adequate notice to permit the relation back of the plaintiffs' [Blue Sky Law claims]....
We find no error in the trial court's decision on the issue of prescription. In passing, we comment on the appellant's argument at the hearing of this appeal: that if, as he asserted, the plaintiffs had no right of action under the LSA-R.S. 12:91 claim asserted originally, then the amending petition had nothing to relate back to. We find no merit in this argument because the court did not dismiss the claim before trial and it was still pending and was heard on its merits at trial. See Hebert v. Doctors Memorial Hosp., supra, 718-721.
Merits of Blue Sky Claim
The first Blue Sky Law of this state was enacted in 1920 "to prevent fraud in the sale of certain securities herein defined, providing for supervision and regulation, and providing penalties." It was reenacted in 1940 and amended a number of times. The applicable liability provisions read as follows in 1974 when the facts of this case arose:
R.S. 51:715. Civil liabilities
A. Any person who:
. . . . .
(3) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying the security from him, who may sue at law to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, cost, and reasonable attorney'* fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition. [Emphasis supplied.]
B. Every person who directly or indirectly controls a seller liable under Subsection (A), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable case could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.
. . . . .
The language closely tracks that of rule 10b-5 of the Securities and Exchange Act of 1934, which appears at 17 C.F.R. 240.10b-5 (1976).[5]
*1380 The difference between the federal and state laws is that to recover under 10b-5 the plaintiff must have exercised "due diligence" in purchasing the stock and the defendant must be shown to have had intent to deceive, manipulate or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); Dupuy v. Dupuy, 551 F.2d 1005 (5th Cir. 1977). Under the Louisiana statute the standard for liability is negligence: the defendant must sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission. The defense of contributory negligence of the purchaser is available. There are few cases on R.S. 51:715 in the jurisprudence, and none that we have uncovered which bear specifically on the substance of the plaintiffs' claim.
The untrue statements of material fact or omission of material facts alleged by the plaintiffs include failure to disclose that the shares were being sold by Thibaut, Republic Securities, Gross, and/or Royal American and not by Thibaut alone; making untrue statements as to the financial condition of the Bank of St. Charles; and failure to disclose, inter alia: that the price of the stock was inaccurate and inflated and included a commission; that the stated earnings were inflated; that the offering of stock was forced upon Thibaut, Republic and All American because they were in violation of law for holding an excess percentage of the Bank's outstanding stock; and that Thibaut, All American and Republic were obligated to repurchase but financially unable to repurchase shares held by Royal American and were selling them to others, while Royal American was unwilling to purchase the shares owned by Thibaut, All American and Republic.
Thibaut maintains that he did not offer or sell the stock under any misrepresentation; if the purchasers were misled by others he did not know and could not have known. The appellees' position is that Thibaut engineered the sales through persons under his control and was aware.
At the outset we must point out that the evidence conclusively shows Thibaut as being in control of the running of the bank, despite his denial. While Terral Ransome handled day to day matters, there was a WATS line at the bank, and both Remy Gross and Alcide Laurent testified that Thibaut and Ransome were in frequent communication on bank business.
Thibaut testified that the purpose of selling the stock was to place a larger percentage of ownership in St. Charles Parish. The bank was growing, he had purchased his interest as an investment, and he (through his companies) no longer needed "numerical control." Royal American had purchased half of Republic Securities' stock earlier on and was willing to sell it back. Thibaut did not meet or approach the plaintiffs, a fact confirmed by their testimony.
Bryan Zeringue, owner of a lumber yard, and Curtis Chauvin, an electrical contractor, both appointed to the Advisory Board in late 1973, testified that Ransome told them the stock was available because Thibaut was planning to retire and wished to sell his interest. Both men testified that they were told the stock would triple in value if multi-banking were passed by the legislature. Dr. William Landry stated that his trusted patient and friend, "Dee Dee" Friloux, had told him that the bank was selling stock to local investors and it was the opportunity of a lifetime. As everything Friloux touched turned to gold he agreed to invest. Alcide Laurent had heard both Thibaut and Ransome offer the stock and say that multibank legislation was sure to come. The three plaintiffs were told the bank would arrange financing and they could probably pay only the interest for a while.
Testimony of Remy Gross and the deposition of Ransome indicated that Thibaut *1381 personally offered the stock to the Executive Committee. He said also that Thibaut invited a group of directors to a meeting at Antoine's, where he asked each person how much stock they would like to buy and said they would get a large bank to finance it in one large loan. As it turned out the loans were placed in various banks. Rolfe McCollister, Chairman of the Board of Royal American, testified that by March, 1974, the banking community was of the opinion that multi-banking legislation would not be passed in 1974; it was not. On the other hand Alcide Laurent testified that at the time he bought stock the bill for multi-parish banking was still alive although people were not sure it would pass.
The most serious allegation made by the purchasers is that Thibaut failed to disclose that he would receive a $10 commission for every share of stock sold. Thibaut denied having received the money himself, but admitted that Republic Securities, his corporation did receive the money, which amounted to $400,000 on 40,000 shares sold. Thibaut acted as agent for the group of purchasers in negotiating the price per share of $50 with Royal American but charged them $60 per share. He testified that the "commission" of $10 was reimbursement for Republic's giving up the valuable right to repurchase the stock, which was agreed upon in the original sale by Republic to Royal American. His statement was contradicted by Rolfe McCollister, who testified that he knew of no repurchase agreement and as chairman of the board would have known if one existed. We note further that in a letter to Ernst & Ernst, accountants, dated August 14, 1974, and signed by Thibaut as chairman of the board of Republic Securities, it is stated that:
Royal American, in December 1972, had acquired 40,000 shares of Bank of St. Charles stock from Republic Securities and All American Assurance Company. The sale of 40,000 shares in December 1972 and partial repurchase of 33,000 shares in March 1974 were "arms-length" transactions, and did not involve any other agreements, such as repurchase agreements, loan guarantees, or take-out commitments, between Royal American and Republic, its subsidiaries, affiliates, officers, directors and/or stockholders, individually or collectively.
Thibaut failed to produce any documentary evidence of a repurchase agreement and we conclude that his corporation made a profit.
From the testimony of Henry N. Harris, Chief Examiner for the State of Louisiana, and Harold Dey, a CPA and expert in audit of financial institutions, it is apparent that financial reports generated by the bank did not present a true picture of the bank's condition prior to and at the time of the sales. Harris was in charge of the examinations of the Bank of St. Charles dated September 10, 1973 and November 11, 1974. He stated that the November, 1974 examination showed "an enormous increase in classified loans over our previous examinations (1973)." He also testified that the adjusted capital and reserves to adjusted gross assets ratio was well below the average for all state banks, and that overdue loans represented 11.4% of the total portfolio.
Harold Dey, after reviewing all the internal financial statements and examiners' reports concluded that the net income of 1973 and 1974 would have shown losses if the bank had made adequate provision for losses and recorded bad debt expenses properly. Instead of the $30 per share book value testified to by Thibaut, or $23 to $24 calculated by Remy Gross, or even the $20 value estimated by Ransome, Dey's calculation was a book value of $13.86 as of June 28, 1974, after adjusting capital for loss loans.
Thibaut denied any knowledge of the bank's having problems prior to the 1974 examination. He denied any involvement in evaluating or setting up loan reserves. He stated that as far as he knew the operating statements were accurate and he did not see them until the board meetings. Roy Mongrue prepared all financial reports as he had done for years, and Thibaut was sure that Ransome reviewed them. He trusted the two men and had no reason to doubt them. It is doubtful that Ransome *1382 received the reports fully. He testified as follows that he did not realize some of the bank's outstanding loans were overline until the bank examiners called the problem to his attention in 1974:
Q Do you remember the magnitude of the amount by which these loans exceeded the bank's legal lending limit?
A It's hard for me to determine because I was under the impression that capital notes were a part of the capital structure of the bank, so I didn't realize they were overlines; I thought they were within the bank's lending limits.
Q All right. Could you give me a little more of that detail? I'm not sure I'm following you. You thought thatas I understand it
A The bank had a capital and surplus and undivided profits and they also had a one million dollar capital note.
Q All right. And it was your understanding that the legal limit was what?
A Fifty per cent of capital surplus undivided profits and the total capital structure of the bank.
Q So you would include all of that in figuring capital before you took the fifty per cent to get the limit?
A That's my understanding, yes.
Ransome admitted that he seldom if ever reviewed the minutes of board meetings.
The evidence cited above points to a pattern during Thibaut's tenure of inaccurate reporting, resulting in misleading information as to the bank's condition at the time the bank stock was sold. Thibaut cannot avoid culpability when he was an experienced banker, the chief officer of the bank, and in control through stock ownership and voting rights. If he did not know he should have known. We conclude that Thibaut failed to sustain the burden of proof that, "in the exercise of reasonable care [he] could not have known of the untruth or omission."
Severance
Thibaut elected a jury trial, while the remaining defendants chose to have the claims against them tried by a judge. The appellant assigns as error the judge's granting the plaintiffs' motion to sever Thibaut's trial from the jury trial.
This issue was referred to our court by writ No. 86-C-272. Thibaut's writ opposing the severance was denied on May 6, 1986, after which the Supreme Court unanimously denied the writ on May 9, 1986 in No. 86-CC-0870. We remain convinced that there was no abuse of the trial court's discretion. La.C.C.P. art. 465; White v. Cumis Ins. Soc., 415 So.2d 574 (La.App. 3rd Cir.1982), writ denied 420 So.2d 164 (La.1982).
Judgment Notwithstanding the Verdict
The trial judge ruled prior to trial that a negligence standard applied to the Blue Sky claim and that contributory negligence was available as a defense. After trial he granted Dr. Landry's motion seeking to overturn the jury's finding of contributory negligence.
A review of the testimony indicates that among the three plaintiffs no one had expertise in financial or banking matters and took at face value the information given to them about the stock. Dr. Landry had known Mr. Friloux for years and respected him as an excellent businessman and leader in the community. He bought the stock because Mr. Friloux was buying it also. We are unable to discern that Dr. Landry was negligent in failing to investigate further or that he had any reason not to believe in Mr. Friloux's sincerity. Accordingly, we hold that the trial court's decision was not in error.
Summarizing our discussion of issues raised regarding the claim under R.S. 51:715, we affirm the judgment insofar as it pertains to that claim.
Award
The trial court, in rendering judgment on quantum calculated the proper measures of damages for both the breach of fiduciary duty claim and the Blue Sky claim. He then awarded the plaintiffs the sums calculated under the breach of fiduciary duty claim plus $150,000 in attorneys' fees.
*1383 As this court has reversed the trial court's judgment as to the breach of fiduciary claim but has affirmed the Blue Sky claim, we must revise the judgment to award appropriate damages.
The trial judge's calculation of damages on the Blue Sky Claim is as follows:
to Dr. W.B. Landry a principal sum of $75,000.00 and interest of $31,667.00 together with twelve (12%) percent annual interest on the principal amount from November 13, 1986 until paid;
to Bryan Zeringue a principal sum of $84,562.00 and interest of $53,675.00 together with twelve (12%) percent annual interest on the principal amount from November 13, 1986 until paid;
to Curtis Chauvin a principal sum of $81,843.00 with interest of $62,848.00 together with twelve (12%) percent annual interest on the principal amount from November 13, 1986 until paid;
and reasonable attorney's fees of $150,000.00 together with legal interest of twelve (12%) percent from November 13, 1986 until paid.
R.S. 51:715, (A)(3) provides the following damages:
"... the consideration paid for the security, together with interest at six percent per year from the date of payment, cost, and reasonable attorney'* fees, less the amount of any income received on the security, upon the tender of the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition."
It is unclear from the evidence submitted exactly how the trial judge arrived at the principal amounts, although counsel for plaintiffs suggests the award was based on actual cash paid. The interest amounts were brought out in the testimony as interest paid on the promissory notes with which the plaintiffs paid for their shares. Possibly the judge allowed this interest as a cost of purchase in lieu of the statutory interest of 6% from date paid. In light of the difficulty of calculating the damages precisely in accordance with the statute, we find the judge's assessment of damages to be reasonable and within his discretion. LSA-C.C. art. 1999.
As to attorney's fees, the complexity of the case leaves no doubt in our minds as to the appropriateness of the award of $150,000 plus 12% interest from date of judgment. The award of interest on attorney's fees is discretionary. DeBlieux v. Arkla Industries, Inc., 390 So.2d 233 (La. App. 3rd Cir.1980), writ denied, 396 So.2d 901 (La.1981).
Decree
For the reasons assigned above, we affirm the judgment insofar as it finds in favor of the plaintiffs, Dr. W.B. Landry, Bryan Zeringue, and Curtis Chauvin, and against defendant Charest Thibaut, Jr., on their claim for damages under the Blue Sky Law, LSA-R.S. 51:715. We revise the judgment to award the amounts found by the trial court to be proper under the Blue Sky Law claims, as follows:
to Dr. W.B. Landry a principal sum of $75,000.00 and interest of $31,667.00 together with twelve (12%) percent annual interest on the principal amount from November 13, 1986 until paid;
to Bryan Zeringue a principal sum of $84,562.00 and interest of $53,675.00 together with twelve (12%) percent annual interest on the principal amount from November 13, 1986 until paid; and
to Curtis Chauvin a principal sum of $81,843.00 with interest of $62,848.00 together with twelve (12%) percent annual interest on the principal amount from November 13, 1986 until paid.
We reverse the judgment insofar as it finds in favor of the plaintiffs and against the defendant on their claim for damages for breach of fiduciary duty to shareholders as provided by LSA-R.S. 12:91. In all other respects the judgment is affirmed.
We award to the plaintiffs additional attorney's fees of $5,000 for this appeal and all costs of this proceeding.
*1384 AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] Republic Securities Corporation and All American Assurance Company were corporations of which Thibaut was chairman of the board, general counsel, and principal shareholder, and through which Thibaut owned controlling interest in the Bank of St. Charles, beginning in 1972.
[2] Therral Ransome, President; Roy A. Mongrue and Alcide J. Laurent, Executive Vice Presidents; Otto Candies, Henry J. Friloux, Sr., and A.J. Lousteau, Vice-Presidents; Gary J. Anderson, Remy F. Gross II, Robert E. Weimer, Stuart E. Creel, C.S. Lagarde, Jr., and Murphy E. Majoria, members of the Executive Committee as were Thibaut, Ransome, and Friloux; Clifford C. Comeaux, Sidney C. Dubroca, Jules J. Hymel, C.S. Lagarde, Sr., Gordon O. Landry, and Paul Richard, directors only. Therral Ransome died during the litigation and his succession representative was named defendant in his place. Remy F. Gross II settled his case and was dismissed before trial.
[3] The order reads as follows:

Upon notification of the most recent action of the United States Court of Appeals, Fifth Circuit, and being of the view that this matter is now, in all respects, resolved except for action by this court in connection with the "state law claim" noted in the Fifth Circuit Court of Appeals opinion of October 7, 1982, it is ordered that the "state law claim" noted above be and the same is hereby relegated to the state courts of Louisiana.
Since no further action is necessary by this court, this matter is deemed to be, in all respects, closed.
[4] Upon remand the trial court again dismissed the claim, on a motion for summary judgment. The First Circuit again reversed and remanded, opinion reported at 492 So.2d 54 (La.App. 1st Cir.1986), writ denied 496 So.2d 355 (La.1986).
[5] 17 C.F.R. 240.10b-5 (1976) states in part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, ...
(1) to employ any device, scheme, or artifice to defraud,
(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale any security.