714 So.2d 188 (1998)
Evald O. BECKSTROM
v.
Steven W. PARNELL and Morgan Keegan & Company, Inc.
No. 97 CA 1200.
Court of Appeal of Louisiana, First Circuit.
May 15, 1998.
*189 Denise Nelson Akers, Baton Rouge, for Plaintiff-Appellee Evald O. Beckstrom.
C. Michael Hart, Baton Rouge, for Defendants-Appellants Steven W. Parnell and Morgan Keegan and Company, Inc.
Before FOIL and FITZSIMMONS, JJ., and CHIASSON,[1] J. Pro Tem.
REMY CHIASSON, Judge Pro Tem.
This suit was filed on behalf of Mr. Evald Beckstrom against his stockbroker, Steve Parnell, and his employer, Morgan Keegan & Company, Inc. (Morgan Keegan), for violations *190 of the Louisiana Securities Laws, breach of contract and breach of fiduciary duty. Clelie Carpenter, Mr. Beckstrom's daughter, initially filed the suit pursuant to a power of attorney she held on behalf of her father. During the pendency of the action, Mr. Beckstrom died. Mrs. Carpenter and Mr. Beckstrom's son, Gregory Beckstrom, were substituted as plaintiffs in this matter.
After trial on the merits the trial court found in favor of the plaintiffs and awarded $34,856.44 with legal interest from the date the loss was incurred until paid and attorney fees in the amount of $30,000.00. The defendants appealed, alleging the trial court erred in finding that the plaintiffs proved all the necessary elements of a LSA-R.S. 51:712 violation and in finding that the claim had not prescribed. The plaintiffs answered the appeal, alleging the trial court erred in failing to find the defendants liable for the damages incurred when Mrs. Carpenter directed the liquidation of the Putnam fund to purchase the Ryland fund, including an $18,000.00 service charge incurred as a result of liquidating the Putnam fund before maturity.
At issue in this case are several trades made by Mr. Beckstrom and his daughter, on his behalf, through Mr. Beckstrom's broker, Mr. Parnell. The plaintiffs claim that Mr. Parnell and Morgan Keegan violated the Louisiana Securities Laws by engaging in excessive trading on the Beckstrom account during a time when Mr. Beckstrom was incapable of making decisions for himself. Specifically, the plaintiffs contend that beginning in 1987, the defendants took advantage of Mr. Beckstrom's ill health and alcoholism by inducing him to engage in excessive trading or "churning"[2] of his brokerage account in order to generate sales and brokerage commissions. Plaintiffs also claim that after Mrs. Carpenter began managing her father's affairs in December, 1988, Mr. Parnell misled her into making another inappropriate trade, without disclosing to her the commissions and other sales charges that resulted in the loss of a portion of her father's principal.
The events of this case begin in 1983. At that time Mr. Beckstrom was a retired vice-president of a Fortune 500 company, where he had worked as an accountant. Mr. Beckstrom's wife passed away in 1983 and a short time later Mr. Beckstrom contacted Mr. Parnell at Howard Weil Labouisse, Friedrich regarding his investment portfolio. Mr. Parnell became Mr. Beckstrom's broker, a relationship that continued after Mr. Parnell moved to Morgan Keegan in Baton Rouge.
Through the testimony of those who knew him, Mr. Beckstrom was described as a very sophisticated investor with extensive experience in the stock market. He enjoyed the investment market and subscribed to and regularly read the Wall Street Journal and Value Line, a highly technical investment publication. He was also described as very organized regarding his finances and investments. Until Mr. Beckstrom became partially disabled by a stroke in November of 1988, he personally managed his portfolio of investments in the stock and bond markets, utilizing non-discretionary trading accounts with full service brokerage houses such as Morgan Keegan and the discount brokerage firm of Charles Schwab, Inc. Although Mr. Parnell handled the majority of Mr. Beckstrom's trading after 1983, the account was non-discretionary, meaning that all of the trades were directed by Mr. Beckstrom; neither Mr. Parnell nor Morgan Keegan had any authority to buy or sell any security without Mr. Beckstrom's consent.

Purchase of MINT 13 Units
In 1986, Mr. Beckstrom was involved in a car accident which required an extensive recovery *191 period. As a precautionary measure Mr. Beckstrom opened a joint account with his daughter and executed a power of attorney in her favor in July, 1986. In August, 1986, Mr. Beckstrom placed an order with Morgan Keegan to buy 271 units of Municipal Insured National Trust, Series 13 ("MINT 13"), for $274,547.39. MINT 13 is a tax-free government bond investment trust in which interest paid on the bonds and redemption of the bonds at maturity are passed directly to the investor. Mr. Parnell recommended the MINT 13 investment in response to Mr. Beckstrom's request for a tax-free bond investment vehicle which met his investment objective of 75 percent income and 25 percent growth. Both plaintiffs' and defendants' experts agreed that the MINT 13 purchase was a suitable investment for Mr. Beckstrom.

Sale of MINT 13 and Purchase of Freedom
According to the testimony of Mr. Parnell, Mr. Beckstrom had originally wanted to invest in a bond fund that was free of both federal and state tax. However, at the time that the MINT 13 was purchased, no such funds were available. In 1987, the Freedom Income Trust, # 33 became available, and Mr. Parnell sent information and a prospectus on this fund to Mr. Beckstrom. The Freedom Fund was made up of only Louisiana bonds and was double tax exempt. Mr. Parnell and Mr. Beckstrom discussed the attributes of the Freedom Fund after the latter had read the prospectus. In November, 1987, Mr. Beckstrom directed the sale of 217 units of MINT 13 and the purchase of units in Freedom. The remaining units of MINT 13 were sold on July 29, 1988. Mr. Beckstrom realized an $18,281.64 loss on the two sales of his MINT 13 units. The loss resulted primarily from commissions that had been included in the purchase price. The MINT 13 investment had generated over $21,000.00 in income during the time that Mr. Beckstrom owned it. Mr. Parnell explained that in this type of investment it is advisable to hold the investment for a lengthy period to prevent a loss of principal. However, Mr. Beckstrom wanted to switch because the Freedom Fund was exempt from state and federal taxes, and he believed that the recent election of Governor Roemer would improve the economy of Louisiana and, consequently, the depressed Louisiana bond market would improve. The experts again concluded that the investment in and of itself was a suitable investment for Mr. Beckstrom; however, plaintiff's expert, Mr. Morales, explained that it was unsuitable to switch from one bond trust to another so soon because of the large costs associated with the trade.

Beckstrom's Sale of the Freedom and MINT 13 Units and Investment in the Putnam and Morgan Keegan Mutual Funds
The Louisiana bond market did not fair as well as hoped for. This fact, together with Mr. Beckstrom's loss of interest in handling his investments, prompted him to contact Mr. Parnell. He expressed his concern about the Freedom Fund and his disinterest in continuing to manage his investments. He explained to Mr. Parnell that he wanted to liquidate his positions in all of his individual investments and put his money into managed funds. Mr. Parnell explained that the MINT and Freedom Funds would periodically require reinvestment of funds when bond issues would mature and principal would be returned. Mr. Parnell provided information to Mr. Beckstrom on various stock-based and bond-based mutual funds he thought would meet Mr. Beckstrom's criteria. Mr. Beckstrom researched the various funds and discussed his findings with Mr. Parnell. Thereafter, Mr. Beckstrom decided to place 25% of his assets into a stock-based fund (Morgan Keegan Southern Capital Fund) and 75% in a bond-based fund, the Putnam Tax Free High Yield Bond Fund (Putnam). Pursuant to Mr. Beckstrom's instructions, Mr. Parnell sold all of Mr. Beckstrom's other securities and purchased shares in Putnam and Morgan Keegan Southern Capital Fund. The Freedom Fund was sold in June, 1988, to purchase the Putnam Fund. The commission for the purchase of Putnam was paid up front by Putnam; however, the cost was included in the purchase price so that if the purchaser sold his Putnam shares within five years, he would incur a five percent surrender charge to cover the commission costs.

*192 Liquidation of Putnam and Purchase of Rylands
In November, 1988, Mr. Beckstrom suffered a debilitating stroke. His daughter took over his business affairs, including his brokerage account. Mrs. Carpenter contacted Mr. Parnell and informed him about her father's condition and the need to produce as much income from his account as possible to cover medical expenses. Mrs. Carpenter explained that tax free status was no longer a paramount consideration because there would be numerous deductible medical expenses to offset potential tax liability. According to Mr. Parnell, he was vehemently against selling the Putnam Fund because of the five percent deferred sales charge. However, he stated that Mrs. Carpenter was adamant that she wanted an investment that would produce a fixed income each month so that she could budget her father's expenses. Mr. Parnell testified that he explained to Mrs. Carpenter that she could achieve a fixed income monthly with the Putnam Fund by having principal withdrawn to make up the difference in what was paid out on the fund and what she needed for expenses. Mrs. Carpenter did not like this option because it would deplete principal. Mr. Parnell further explained that the sales charge could be avoided if she moved into another type of Putnam account. Mr. Parnell testified that he researched available options that would provide safe guaranteed fixed income with growth potential. He recommended the Rylands Fund to Mrs. Carpenter. Mrs. Carpenter agreed to the sale of Putnam and the purchase of Rylands.
When Mrs. Carpenter received the confirmation of the sale and purchase, she noticed a sales charge of $18,000.00 and contacted Mr. Parnell. It was explained to her that this charge represented the five percent deferred sales charge from the Putnam Fund. She was also informed that the transaction could be reversed within three days if she chose to do so. Apparently under the misconception that she would maintain a loss on the Ryland stock if she cancelled the transaction, Mrs. Carpenter decided not to cancel the transaction. Shortly thereafter she moved her father's account to another brokerage firm. When questioned concerning whether Mr. Parnell informed her of the five percent deferred sales charge, Mrs. Carpenter stated: "I will not refute that, but except in this regard. However he informed me of it, it was not in such a way to make me stop and reconsider...."
The trial court awarded the plaintiffs damages for the trade from MINT 13 to Freedom and the trade of Freedom to Putnam. However, the court denied recovery on the trade directed by Mrs. Carpenter for the sale of Putnam and the purchase of Rylands. The trial court's reasons base plaintiffs' recovery on the conclusion that the trades were unsuitable[3] for Mr. Beckstrom because of the costs involved. The trial court then concluded that the burden shifted to the defendants to establish that Mr. Beckstrom was fully informed. The lack of written confirmation of Mr. Parnell's disclosures to Mr. Beckstrom led the court to conclude that the defendants had not sustained their burden of proof. Although we do not agree with the trial court's analysis that a finding of "unsuitability" satisfies the plaintiffs' burden of proof under the provisions of LSA-R.S. 51:712,[4] we need not address that issue because *193 of our findings on other issues in this appeal.

PRESCRIPTION
Defendants contend that the plaintiffs' claim has prescribed under the provisions of LSA-R.S. 51:714(C), which provides that "[n]o person may sue under this Section more than two years from the date of the contract for sale or sale, if there is no contract for sale. Because the time period in LSA-R.S. 51:714(C) is prescriptive and not preemptive, the period does not begin to run until the plaintiffs have either actual knowledge of a violation or notice of facts which, in the exercise of due diligence, should lead to actual knowledge." Landry v. Thibaut, 523 So.2d 1370, 1377-1378 (La.App. 5th Cir.) writs denied, 526 So.2d 809 (1988); Romano v. Merrill, Lynch, Pierce, Fenner & Smith, 834 F.2d 523, 529 (5th Cir.1987), cert. denied, 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988), quoting First Federal Savings & Loan Association of Miami v. Mortgage Corporation, 650 F.2d 1376, 1378 (5th Cir.1981).
The defendant correctly points out that the prescriptive period in section 714(C) runs against all persons unless excepted by legislation. LSA-C.C. art. 3467. Indeed, even the interdiction of a party will not stop or suspend the running of prescription. LSA-C.C. art. 3468. Defendants contend that Mr. Beckstrom had available to him all the necessary information by July of 1988, regarding his claims of the sale of the MINT fund and the sale of the Freedom Fund and, accordingly, his action filed on February 22, 1991, for violations of the Louisiana Securities Law had prescribed. We agree.
The plaintiffs claim that the defendant churned the account and failed to adequately inform Mr. Beckstrom concerning the trades. In churning claims, notice of a particular transaction may not be sufficient to trigger notice to the investors. Because the nature of a churning claim usually involves trades over a period of time, an investor may not be aware of the excessive trading early in the course of conduct. In similar cases involving the churning of a customer's account, the courts have held that it is the volume of trading and the nature of the trading, considered in the light of the plaintiff's investment objectives, that constitute the legal wrong. Weiser v. Shwartz, 286 F.Supp. 389, 392 (E.D.La.1968). In Miley v. Oppenheimer & Company, Inc., 637 F.2d 318, 324 (5th Cir. 1981), churning is described as a "unified offense." The court explained that "there is no single transaction, or limited, identifiable group of trades, which can be said to constitute churning. Rather, a finding of churning, by the very nature of the offense, can only be based on a hindsight analysis of the entire history of a broker's management of an account and of his pattern of trading that portfolio, in comparison to the needs and desires of an investor." Miley, 637 F.2d at 327. See also, Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 494 F.2d 168, 171-172 (10th Cir.1974).
Courts must look to the facts and circumstances in each case, including the sophistication of the investor, to determine whether the investor should have been aware of the excessive trading. The receipt of confirmation slips and monthly statements does not always amount to sufficient information to put an investor on notice that the volume of trading in the account was excessive. In Weiser, 286 F.Supp. 389, 393 and Hecht v. Harris, Upham & Co., 430 F.2d 1202, 1210 (9th Cir.1970), the courts considered the investors too unsophisticated in the market to realize that the trading in their accounts was excessive. However, in Romano, the court concluded that the investor was knowledgeable enough to realize that his account was being excessively traded.
Herein, the trial court did not specifically address the knowledge of Mr. Beckstrom with regard to prescription. The court only considered the knowledge of Mrs. Carpenter.[5] This was error. Mr. Beckstrom *194 was never interdicted, and he was in control of his business affairs at the time the MINT and Freedom trades were made. Consequently, it is his knowledge which the trial court should have considered.
While the record contains many facts concerning the decline of Mr. Beckstrom's health and his drinking problem, it does not support a finding that Mr. Beckstrom had lost his ability to understand what was going on in his accounts or that Mr. Parnell usurped control of the account. Mr. Beckstrom's family did not consider him unable to attend to his business affairs until after he had his stroke in November 1988. Furthermore, the testimony indicates that Mr. Beckstrom did nothing that would alert a reasonable person to conclude that he no longer had the ability to handle his business affairs.
Unlike the typical churning case where numerous trades are made and the losses are not detectable until much later in the course of trading, the claim made by the plaintiffs involves only three trades, and the losses on each transaction were immediately detectable because they were not related to market fluctuation but were simply the costs of the transaction. As the defendants point out, these costs are common practice in the industry and should not have been a surprise to Mr. Beckstrom, a seasoned investor. Moreover, the costs associated with the transactions were set forth in the prospectus sent to Mr. Beckstrom.
Considering all the circumstances involved, we believe that Mr. Beckstrom had knowledge of the facts which are the basis of his claim under LSA-51:712 at least by July 1988. Consequently, his claim for violation of the Louisiana Securities Law for the trades involving MINT and Freedom have prescribed.
With regard to the Putnam trade, we cannot say that the trial court was clearly wrong in determining that February 24, 1989, was the date that Mr. Beckstrom, through his daughter, as his agent, received sufficient facts to put him on notice of his claim for the sale of Putnam and the purchase of Ryland. However, neither party assigns as error the trial court's finding that Mr. Parnell did not breach any duties with regard to the Putnam/Ryland transaction. Consequently, we need not address whether the defendants violated the Louisiana Securities Law with regard to the Putnam/Ryland trades.
In addition to the Louisiana Securities Law violation, the plaintiffs' petition alleges claims for breach of contract[6] and breach of fiduciary duty.
Generally a suit for breach of fiduciary duties is a personal action with a 10 year prescriptive period. LSA-C.C. art. 3499. However, courts must consider the underlying claim to determine if the action is indeed one for breach of fiduciary duty which is governed by the 10 year prescriptive period or merely a suit against a fiduciary for negligence which is governed by the one year prescriptive period. LSA-C.C. arts. 3499, 3492. Gerdes v. Estate of Cush, 953 F.2d 201, 204-205 (5th Cir.1992). See also Jolley v. Welch, 904 F.2d 988, 995 (5th Cir.1990), cert. denied, 498 U.S. 1050, 111 S.Ct. 762,112 L.Ed.2d 781 (1991).
The essence of the fiduciary duty lies in the special relationship between the parties. The fiduciary's duty includes the ordinary duties owed under tort principles, as well as a legally imposed duty which requires the fiduciary to handle the matter "as though it were his own affair." Federal Deposit Insurance Corporation v. Caplan, 874 F.Supp. 741, 744 (W.D.La.1995), quoting, Noe v. Roussel, 310 So.2d 806, 819 (La.1975). "In addition, the `fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent.'" Id.
It is this duty of loyalty which distinguishes the fiduciary relationship. Gerdes v. *195 Estate of Cush, 953 F.2d at 205. "A cause of action for breach of fiduciary duty requires proof of fraud, breach of trust, or an action outside the limits of the fiduciary's authority." Gerdes, 953 F.2d at 205.
The breach of fiduciary duty alleged by the plaintiffs for the trades involving Mr. Beckstrom are not simply a claim of breach of a duty of ordinary care. The claim alleges fraud and self dealing which encompass a claim for breach of the higher duty of loyalty owed by a fiduciary. Consequently, the claim qualifies as a personal action subject to the 10 year prescriptive period. See Gerdes, 953 F.2d 201, wherein the court held that the 10 year prescriptive period did not apply to an action for an attorney's actions as a mandatory in a failed real estate deal in the absence of proof of self-dealing or breach of the duty of loyalty. See also, Caplan, 874 F.Supp. at 744, wherein the court held that a breach of fiduciary duty claim was not a mere negligence claim, but it qualified as a personal action subject to the 10-year prescriptive period. Compare Jolley, 904 F.2d 988, wherein the court held that the alleged breaches of fiduciary duties under LSA-C.C arts. 2315, 2316, and 2317 were not contractual or quasi contractual, and thus did not constitute breach of fiduciary duty.

BREACH OF FIDUCIARY DUTY
A broker's duty is fiduciary in nature. Romano, 834 F.2d at 530. In Romano, the court explained the nature of the duty as follows:
It is clear that the nature of the fiduciary duty owed will vary, depending on the relationship between the broker and the investor. Such determination is necessarily particularly fact-based. And although courts draw no bright-line distinction between the fiduciary duty owed customers regarding discretionary as opposed to nondiscretionary accounts, the nature of the account is a factor to be considered ...
The evaluation "requires consideration of the degree of trust placed in the broker and the intelligence and personality of the customer." Quoting Clayton Brokerage Company of St. Louis v. Commodity Futures Trading Commission, 794 F.2d 573, 582 (11th Cir.1986).
Romano, 834 F.2d at 530.
As a general rule, a broker has a duty to give a full and fair disclosure to a securities investor. Thompson, 709 F.2d at 1418. However, depending on the customer-broker relationship, the nature of the transaction, and the sophistication of the customer, the duty can change. In Leib v. Merrill Lynch, Pierce, Fenner & Smith, 461 F.Supp. 951, (E.D.Mich.1978), affirmed, 647 F.2d 165 (6th Cir.1981), the court explained the nature of a broker's duty as follows:[7]
In a non-discretionary account each transaction is viewed singly. In such cases the broker is bound to act in the customer's interest when transacting business for the account; however, all duties to the customer cease when the transaction is closed. Duties associated with a non-discretionary account include: (1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the duty not to misrepresent any fact material to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer.
Of course the precise manner in which a broker performs these duties will depend to some degree upon the intelligence and personality of his customer. For example, where the customer is uneducated or generally *196 unsophisticated with regard to financial matters, the broker will have to define the potential risks of a particular transaction carefully and cautiously. Conversely, where a customer fully understands the dynamics of the stock market or is personally familiar with a security, the broker's explanation of such risks may be merely perfunctory. In either case, however, the broker's responsibility to his customer ceases when the transaction is complete. A broker has no continuing duty to keep abreast of financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments.
* * * * * *
Remarkably absent from the above list is the duty, on the part of the broker, to engage in a particular course of trading. So long as a broker performs the transactional duties outlined above, he and his customer may embark upon a course of heavy trading in speculative stocks or in-out trading as well as upon a course of conservative investment in blue chip securities.
Unlike the broker who handles a non-discretionary account, the broker handling a discretionary account becomes the fiduciary of his customer in a broad sense. Such a broker, while not needing prior authorization for each transaction, must (1) manage the account in a manner directly comporting with the needs and objectives of the customer as stated in the authorization papers or as apparent from the customer's investment and trading history; (2) keep informed regarding the changes in the market which affect his customer's interest and act responsively to protect those interests; (3) keep his customer informed as to each completed transaction; and (5)[sic] explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged.
* * * * * *
Between the purely non-discretionary account and the purely discretionary account there is an hybrid-type account.... Such an account is one in which the broker has usurped actual control over a technically non-discretionary account. In such cases the courts have held that the broker owes his customer the same fiduciary duties as he would have had the account been discretionary from the moment of its creation.
* * * * * *
In determining whether a broker has assumed control of a non-discretionary account the courts weigh several factors. First, the courts examine the age, education, intelligence and investment experience of the customer. Where the customer is particularly young, old, or naive with regard to financial matters, the courts are likely to find that the broker assumed control over the account. Second, if the broker is socially or personally involved with the customer, the courts are likely to conclude that the customer relinquished control because of the relationship of trust and confidence. Conversely, where the relationship between the broker and the customer is an arms-length business relationship, the courts are inclined to find that the customer retained control over the account. Third, if many of the transactions occurred without the customer's prior approval, the courts will often interpret this as a serious usurpation of control by the broker. Fourth, if the customer and the broker speak frequently with each other regarding the status of the account or the prudence of a particular transaction, the courts will usually find that the customer, by maintaining such active interest in the account, thereby maintained control over it.
Leib, 461 F.Supp. at 952-955. (Citations omitted.)
The plaintiffs alleged that Mr. Beckstrom was impaired because of his drinking and advanced age. They assert that Mr. Parnell either knew or should have known of this impairment and entered into trades for Mr. Beckstrom which he knew or should have known would be unsuitable because of the high transaction costs and because the return on the investment would be less. They further contend that Mr. Parnell breached his fiduciary duty by failing to disclose *197 material facts to Mr. Beckstrom and Mrs. Carpenter, specifically: (1) the exact amount of the commissions involved in the trades; (2) the percentage of commission he would earn on each trade as a percentage of the total investment dollars; (3) the fact that the income from each new investment would be less than the income from the former investment (4) the amount of deferred sales charge on the sale of Putnam.
The crux of plaintiffs' argument is that Mr. Beckstrom was not capable of understanding the full financial impact of the trades based on the information provided by Mr. Parnell, i.e., prospectus and general information. On the other hand, the defendants contend that Mr. Beckstrom was fully aware of the financial consequences of the trades and chose to pursue them for other valid reasons. Defendants argue that Mr. Beckstrom was a very sophisticated investor and was informed of the status of his account through confirmation slips mailed within one day of each transaction and through his monthly account statements.
Mr. Beckstrom's account was a non-discretionary account with Mr. Beckstrom directing all the transactions. The experts testified that each investment involved in plaintiffs' claims were good investments. Plaintiffs do not allege that the defendants breached any duties with regard to the execution of the transactions themselves. In essence, the plaintiffs contend that Mr. Parnell had the duty to disclose facts beyond the basic information required in non-discretionary transactions and to discourage Mr. Beckstrom from making the trades which he ordered. To impose this duty on Mr. Parnell, the plaintiffs must prove that Mr. Parnell essentially usurped control over the account by proving that (1) Mr. Beckstrom and Mrs. Carpenter were incapable of understanding the information that Mr. Parnell presented; (2) Mr. Parnell was aware or should have been aware of this incapacity; and (3) Mr. Parnell failed to fully inform them or purposefully defrauded them.
The facts elicited at trial revealed that Mr. Beckstrom had a life-long drinking problem. Mrs. Carpenter testified that she related this problem to Mr. Parnell at her father's home in the summer of 1987 when she apologized for her father's behavior. Mrs. Carpenter testified that her father no longer drove after an automobile accident in 1986 and that his drinking got worse during 1987. He suffered a broken hip in 1987, and in the fall of 1988 was diagnosed with prostrate cancer. In November, 1988, he suffered a debilitating stroke.
Mr. Greg Beckstrom testified that he visited his father every other day. He described his drinking as excessive, but not to the point where he was stumbling. He stated that the drinking caused his father to become belligerent. He could not say exactly when his father became so impaired that he could no longer handle his affairs; however, he did state that he noticed his father's things stacking up after his hip replacement surgery in 1987. He further stated that he did not believe that his father would have permitted his sister to take over his finances prior to his stroke in 1988.
Ms. Gloria Prejean worked for Mr. Beckstrom as a nurses' aide from May 1987, until January, 1990. She testified that he began getting forgetful approximately six months after his hip replacement and began asking for his deceased wife in early 1988. He started sneaking alcoholic drinks. He exhibited bizarre behavior, such as urinating in public places and stealing cigarettes. She also recalled an incident where he accidentally set a garbage can on fire. Ms. Prejean recalled Mr. Parnell visiting Mr. Beckstrom on three occasions. She stated that she did not believe that Mr. Parnell would have been able to tell that Mr. Beckstrom was drinking, but that sometimes Mr. Beckstrom would sound confused and repeat the same questions. She further stated that Mr. Beckstrom did not do anything to cause Mr. Parnell to realize that he had lost his ability to understand what was being said. Mr. Beckstrom never drank in the presence of Mr. Parnell. During this time Mr. Beckstrom would call Mr. Parnell every other day. She also testified that it never appeared to her that Mr. Parnell was trying to "pull a fast one."
Charles Carpenter, Mr. Beckstrom's son-in-law, also visited Mr. Beckstrom four to *198 five times per week. He shared Mr. Beckstrom's passion for investments and often discussed such matters with Mr. Beckstrom. Mr. Carpenter testified that there was no reason for the family to believe he was not taking care of his financial situation "up until the time of the stroke." However, he did not believe that Mr. Beckstrom was able to make investment decisions during 1987.
Mr. Tom Piland, Mr. Beckstrom's CPA, testified that he handled Mr. Beckstrom's taxes for 1986 through 1988. He had no concerns about Mr. Beckstroms' competence or intelligence before the stroke.
Mr. Daniel Tobey, a broker with A.G. Edwards, testified that Mrs. Carpenter contacted him in January, 1989, concerning her father's investments because she was dissatisfied with Morgan Keegan. Mrs. Carpenter did not tell him that her father was incompetent, but stated that he lacked the desire to handle his investments. Mrs. Carpenter did not indicate to Mr. Tobey that her father had a drinking problem. Mr. Tobey met with Mr. Beckstrom on February 9, 1989, to assure himself that Mr. Beckstrom was competent. He described Mr. Beckstrom as quiet, reserved, and gentlemanly. After the visit Mr. Tobey wrote a memo attesting to Mr. Beckstrom's competence.[8] Mrs. Carpenter handled her father's account with A.G. Edwards and approved a $46,000.00 purchase of American Tax Credit in late 1989. Mr. Tobey explained that the investment provides a $7,000.00 tax credit each year for 10 years. He described this investment as a "smoking hole" because you get nothing out of it. Mrs. Carpenter also approved the sale of $55,00.00 of Ryland to purchase a camp for herself and her brother.[9]
Mr. Parnell testified that from May of 1987 until his stroke, Mr. Beckstrom called him every week. He did not believe that Mr. Beckstrom was incompetent before the stroke, and he never saw him drink.
There is no question that Mr. Beckstrom was a sophisticated and knowledgeable investor and that he directed all the trades in his Morgan Keegan account. Mr. Parnell had no authority to make independent investment decisions, but instead acted solely at Mr. Beckstrom's and Mrs. Carpenter's request. Mr. Parnell provided prospectus and general information on each investment.[10] Each investment was considered suitable for Mr. Beckstrom's investment objectives. Mr. Beckstrom called Mr. Parnell twice weekly concerning his account. The evidence presented does not support a finding that Mr. Beckstrom was incapable of understanding the information supplied by Mr. Parnell; nor does it support a finding that Mr. Parnell was aware or should have been aware of any impairment of Mr. Beckstrom's ability to understand the transactions which he ordered. To the contrary, the evidence indicates that Mr. Beckstrom was in control of his business affairs until the stroke in November, 1988.
After considering all the evidence presented, we conclude that the plaintiffs have not sustained their burden of proving that Mr. Parnell breached his fiduciary duty to Mr. Beckstrom personally or through his daughter. See, Leib, 461 F.Supp. 951; Romano, 834 F.2d 523; Williams v. Edward D. Jones & Co., 556 So.2d 914 (La.App. 3d Cir.), writ denied, 559 So.2d 1367 (La.1990). See also, Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014 (5th Cir.1990) and Puckett v. Rufenacht, Bromagen & Hertz, Inc., 949 F.2d 789 (5th Cir.1992) wherein the court held that a stockbroker has no duty to determine *199 the suitability of his customer for commodities trading.
For the foregoing reasons, we affirm the portion of the trial court judgment denying recovery under the Louisiana Securities Law for the Putnam/Ryland trade and reverse the remainder of the judgment. All costs of this appeal are to be paid by the plaintiffs.
AFFIRMED IN PART AND REVERSED IN PART.
FITZSIMMONS, J., dissents and assigns reasons.
FITZSIMMONS, Judge, dissenting with reason.
My concern is that the majority implicitly rejects the "transactions" of the real world of the infirm. While I concur that the daughter had a power of attorney, I am troubled by this broker's failure to be mindful of the deleterious effects of age: no matter how skilled an investor Mr. Beckstrom demonstrated by past actions, age of the investor must force a broker to constantly challenge his/her reliance on the investor's history.
Despite the fact that Mr. Beckstrom had not been interdicted, it had to have been clear that such sudden changes in investments were not executed in the client's best interest. The broker had a duty to "do the math" and present the results of such a change, in writing, to the investor. The elderly deserve to "see" the "math" so that they can cogitate and ruminate over such a move. There is no evidence in the record which would indicate that this investor was presented, in writing, with a clear picture of what such a sale and redemption would create in terms of the total value of the account. The understanding of such a "move" is significant; it can not be washed away by the flood of "confirmation slips" that the investor received. The reason for the sale was to gain refuge from state taxes: however, if the loss in the principal does not out perform the gain in tax savings, we have an unsuitable set of trades. There is nothing in writing to delineate the consequences of the trades. I note that the S.E.C. regulations do not permit a full-service broker to default to performing as an "order taker" when the ethical responsibility circumscribes the ever changing competency of his/her client.
I respectfully dissent. The state of mind of the investor does not relieve the broker/brokerage firm of its obligations as a fiduciary.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Churning occurs when a securities broker buys and sells securities for a customer's account, without regard to the customer's investment interests, for the purpose of generating commissions. McNeal v. Paine, Webber, Jackson & Curtis, Inc., 598 F.2d 888, 890 n. 1 (5th Cir. 1979). To establish a cause of action for churning under section 10-b of the Securities Exchange Act of 1934, 15 U.S.C. sec. 78j(b) and S.E.C. Rule 10b-5, an investor must establish that "(1) the trading in his account was excessive in light of his investment objectives; (2) the broker in question exercised control over the trading in the account; and (3) the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interest." Miley v. Oppenheimer & Company Inc., 637 F.2d 318, 324 (5th Cir.1981). Herein, the trial court specifically found that the plaintiffs failed to prove that churning occurred.
[3] Suitable refers to the "suitability" rule of the National Association of Securities Dealers which provides that when a broker recommends a purchase, sale, or exchange of any security, the member-broker "shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs." N.A.S.D. rules Chapter 3 section III(2)(a).
[4] The trial court, citing Taylor v. First Jersey Securities, Inc., 533 So.2d 1383 (La.App. 4 Cir. 1988), writs denied, 538 So.2d 593, 594 (La.1989) apparently concluded that a private cause of action based on the unsuitability of the investment was encompassed within the Louisiana Securities Law. We do not believe that a private cause of action for "suitability" exists under Louisiana Securities Law. However, we believe that the factors which make the trades unsuitable can be considered in determining whether the proper disclosures have been made to the customer pursuant to LSA-R.S. 51:712. See, Miley, 637 F.2d at 333; Thompson v. Smith Barney, Harris Upham & Co. Inc., 709 F.2d 1413, 1419 (11th Cir.1983). See also, Colonial Realty Corporation v. Bache & Co., 358 F.2d 178 (2nd Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966).
[5] With respect to the issue of prescription, the trial court concluded that "Ms. Carpenter's testimony is credible, that she did not know until February 24th [1989] that something was amiss that caused her to look at the other transactions."
[6] The plaintiffs do not contend that defendants breached a specific contract agreement. Instead, their claim is more in the nature of an implied contractual agreement based upon the duties owed by the defendants as agents for Mr. Beckstrom. Accordingly, we will treat this claim as part of plaintiff's breach of fiduciary duty claim.
[7] Leib involved a claim that a stockbroker had violated his fiduciary duty under the Securities Exchange Act by failing to disclose to the customer the consequences of the pattern of trading he was pursuing through a non-discretionary account. The court held that the broker had no duty to inform a customer who is managing his own account that his trading strategy is particularly risky.
[8] The internal office memorandum read:

Having visited personally with Mr. E.O. Beckstrom, I attest to the fact that his shaky signature is a result of physical disability (he suffered a stroke in Oct "88), and not mental incompetence. He is agreeable to doing business w/Merrill Lynch through Clelie Carpenter (his daughter) as agent.
[9] Further, testimony revealed that she and her brother executed a loan for the $55,000.00; however, the loan was repaid from moneys paid to her and her brother out of her father's account. Mrs. Carpenter explained that her father traditionally gave them gifts of money, and she continued this practice on his behalf.
[10] Generally courts are "reluctant to find that there have been misrepresentations when a prospective customer has received disclosure documents." Hill v. Bache Halsey Stuart Shields Inc., 790 F.2d 817, 824 (10th Cir.1986).