Joel LEIB, Trustee for the benefit of Sheldon Leib, and Sheldon Leib, Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., and John Kulhavi, Defendants.

Civ. A. No. 5–71591.

United States District Court, E. D. Michigan, S. D.

Oct. 30, 1978.

Harry D. Hirsch, Jr., Southfield, Mich., for plaintiffs.

Douglas G. Graham, Richard P. Saslow, Butzel, Fruhauf, Keidan, Simon Myers & Graham, Detroit, Mich., for Merrill Lynch, etc.

Gerald C. Davis, Cummings, McClorey, Davis & Acho, P.C., Livonia, Mich., for John Kulhavi.

### OPINION

FEIKENS, District Judge.

## I. INTRODUCTION

In August 1975 Sheldon Leib (Leib, also hereinafter designated as plaintiff) with his brother Joel Leib, as trustee, brought suit against Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) and John Kulhavi (Kulhavi), a stockbroker employed by Merrill Lynch, alleging as his first claim that these defendants "churned" his securities account. Plaintiff also submitted a second claim—that Kulhavi had breached his fiduciary duty by allowing Leib to pursue a course of heavy trading which could not possibly have resulted in a profit. Tied to this claim is plaintiff's contention that Kulhavi, as the broker in charge of the account, should have thoroughly explained to Leib the consequences of his pattern of trading, particularly with respect to the amount of commissions which would be generated as compared to the amount of profits which could be realized.

## II. THEORIES OF THE PARTIES AND THE APPLICABLE LAW

Churning occurs "when a broker, exercising control over the volume and frequency of trading, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account." *Carras v. Burns*, 516 F.2d 251, 258 (4th Cir. 1975). It is a deceptive device actionable under Section 10(b) of the Securities Exchange Act and Rule 10b–5 of the Securities and Exchange Commission. See generally, Note, Churning by Securities Dealers, 80 Harv.L.Rev. 869 (1967). In order to evaluate plaintiff's second claim it is necessary to examine generally the duties owed by a stockbroker to his customer. Plaintiff argues that a broker has a fiduciary duty to his customer similar to that owed by an attorney to his client. Defendants contend that a stockbroker has a limited duty to serve his customer's financial interest within the framework of a single transaction only. Neither position is entirely accurate.

Defendants' limited definition of a broker's duty to his customer is correct so long as the customer has a non-discretionary account with his broker, *i. e.*, an account in which the customer rather than the broker determines which purchases and sales to make. In a non-discretionary account each transaction is viewed singly. In such cases the broker is bound to act in the customer's

interest when transacting business for the account; however, all duties to the customer cease when the transaction is closed. Duties associated with a non-discretionary account include: (1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis. *Cash v. Frederick and Co.*, 57 F.R.D. 71 (E.D.Wis.1972); *Hanly v. S.E.C.*, 415 F.2d 589 (2d Cir. 1969); (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests, *Richardson v. Shaw*, 209 U.S. 365, 28 S.Ct. 512, 52 L.Ed. 835 (1908); *Robinson v. Merrill Lynch*, 337 F.Supp. 107 (N.D.Ala.1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972), and cases cited therein; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security, *Hanly v. S.E.C., supra; Cash v. Frederick and Co., supra* ; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security, *Chasins v. Smith Barney & Co.*, 438 F.2d 1167 (2d Cir. 1971); *S.E.C. v. Capital Gains Bureau*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); (5) the duty not to misrepresent any fact material to the transaction, *Carras v. Burns, supra; Shorrock v. Merrill Lynch*, CCH Fed.Sec.L. Rep. ¶ 96,251 (D.Or., Nov. 18, 1977); and (6) the duty to transact business only after receiving prior authorization from the customer, *Robinson v. Merrill Lynch, supra.*

Of course the precise manner in which a broker performs these duties will depend to some degree upon the intelligence and personality of his customer. For example, where the customer is uneducated or generally unsophisticated with regard to financial matters, the broker will have to define the potential risks of a particular transaction carefully and cautiously. Conversely, where a customer fully understands the dynamics of the stock market or is personally familiar with a security, the broker's explanation of such risks may be merely perfunctory. See in this regard, *Moscarelli v. Stamm*, 288 F.Supp. 453 (E.D. N.Y.1968); *Shorrock v. Merrill Lynch, supra; Weiser v. Shwartz*, 286 F.Supp. 389

(E.D.La.1968). In either case, however, the broker's responsibility to his customer ceases when the transaction is complete. A broker has no continuing duty to keep abreast of financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments. Although a good broker may choose to perform these services for his customers, he is under no legal obligation to do so. *Robinson v. Merrill Lynch, supra.*

Remarkably absent from the above list is the duty, on the part of the broker, to engage in a particular course of trading. So long as a broker performs the transactional duties outlined above, he and his customer may embark upon a course of heavy trading in speculative stocks or in-out trading as well as upon a course of conservative investment in blue chip securities.

Unlike the broker who handles a non-discretionary account, the broker handling a discretionary account becomes the fiduciary of his customer in a broad sense. Such a broker, while not needing prior authorization for each transaction, must (1) manage the account in a manner directly comporting with the needs and objectives of the customer as stated in the authorization papers or as apparent from the customer's investment and trading history, *Rolf v. Blyth Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir. 1978); (2) keep informed regarding the changes in the market which affect his customer's interest and act responsively to protect those interests (see in this regard, *Robinson v. Merrill Lynch, supra*) ; (3) keep his customer informed as to each completed transaction; and (5) explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged, *Stevens v. Abbott, Proctor and Paine*, 288 F.Supp. 836 (E.D.Va.1968).

Although no particular type of trading is required of brokers handling discretionary accounts, most concentrate on conservative investments with few trades— usually in blue chip growth stocks. Where a broker engages in more active trading,

particularly where such trading deviates from the customer's stated investment goals or is more risky than the average customer would prefer, he has an affirmative duty to explain the possible consequences of his actions to his customer. This explanation should include a discussion of the effect of active trading upon broker commissions and customer profits:

> The defendant, Winston's relationship with his uninformed customer was one of special trust and confidence, and the Court finds that he was because of this position, under a duty to frankly and forthrightly explain to plaintiff the nature of the commissions, concessions, losses and profits which were being generated in her account.

*Stevens v. Abbott, Proctor and Paine, supra*, at 846. As the court further stated in *Stevens*, the broker who acts in this capacity owes a special duty to his customer:

> In view of the Court's finding, it is apparent that a fiduciary relationship in law existed between the plaintiff and Winston which placed upon him the duty of acting in the highest good faith toward the plaintiff.

*Stevens, supra* at 847.

■ Between the purely non-discretionary account and the purely discretionary account there is a · hybrid-type account which plaintiff claims existed in this case. Such an account is one in which the broker has usurped actual control over a technically non-discretionary account. In such cases the courts have held that the broker owes his customer the same fiduciary duties as he would have had the account been discretionary from the moment of its creation.

In *Hecht v. Harris*, 430 F.2d 1202 (9th Cir. 1970), the plaintiff, a 77 year old widow, opened a non-discretionary account with a major brokerage firm. Consistent with the practice in such accounts plaintiff received confirmation slips of each transaction and monthly statements on the status of her account. In addition, she spoke personally with the defendant broker several times a week. Nonetheless, the court held that the broker was liable to plaintiff for churning her account on the ground that he had traded excessively without informing plaintiff of the potential hazards involved in such a course of trading. Since the plaintiff was informed, for the most part, of the individual transactions in her account, the court's holding assumed that the defendant owed plaintiff the additional fiduciary duty to explain the risks of pursuing a particular course of trading. That assumption derived from the court's finding that the broker had taken full control over the plaintiff's account and thus owed her those fiduciary duties normally associated with discretionary accounts. See also, *Carras v. Burns, supra; Stevens v. Abbott, Proctor and Paine, supra.*

In determining whether a broker has assumed control of a non-discretionary account the courts weigh several factors. First, the courts examine the age, education, intelligence and investment experience of the customer. Where the customer is particularly young, *Kravitz v. Pressman, Frohlich & Frost*, 447 F.Supp. 203 (D.Mass. 1978), old, *Hecht v. Harris, supra*, or naive with regard to financial matters, *Marshak v. Blyth Eastman Dillion & Co., Inc.*, 413 F.Supp. 377 (N.D.Okl.1975), the courts are likely to find that the broker assumed control over the account. Second, if the broker is socially or personally involved with the customer, the courts are likely to conclude that the customer relinquished control because of the relationship of trust and confidence. *Kravitz v. Pressman, supra; Hecht v. Harris, supra.* Conversely, where the relationship between the broker and the customer is an arms-length business relationship, the courts are inclined to find that the customer retained control over the account. *Shorrock v. Merrill Lynch, supra.* Third, if many of the transactions occurred without the customer's prior approval, the courts will often interpret this as a serious usurpation of control by the broker. *Hecht v. Harris, supra.* Fourth, if the customer and the broker speak frequently with each other regarding the status of the account or the prudence of a particular transaction, the courts will usually find that the custom-

er, by maintaining such active interest in the account, thereby maintained control over it. *Robinson v. Merrill Lynch, supra.*

### III. FINDINGS OF FACT

Leib is now 34 years old. He attended college at Detroit Institute of Technology where he majored in applied science. After graduation from the Institute in 1964 Leib attended Walsh College. He received his accounting certificate from Walsh College in 1969. During his college career he took courses in economics and finance. He stated that the courses did include some limited instruction in securities and investment theory. Since 1969 Leib has held approximately eight different jobs, each involving accounting and bookkeeping and some additionally involving management and personnel supervision. He is now employed as an accountant and tax consultant with the firm of Samuel Tolchim.

Leib began trading in securities in 1966 when, at the recommendation of his uncle, he purchased 1200 shares of Frank's Nursery stock. That same year he purchased stock in at least five other small companies through the brokerage firm of Manley, Bennett, McDonald & Co. According to Leib, he simply informed the broker at Manley, Bennett, McDonald & Co. which stocks to purchase or sell and the broker executed his orders.

In the latter part of 1971 Leib was introduced to the defendant Kulhavi. Joel Leib, Sheldon's brother, an osteopathic surgeon, knew the Kulhavi family professionally and suggested to Leib that he should seek investment advice from Kulhavi. On December 8, 1971 Leib met with Kulhavi to discuss Leib's financial affairs, particularly as they related to a securities account. The parties discussed the advantages and disadvantages of trading on margin and, that same day, Leib opened a margin account with Merrill Lynch, depositing $30,000 which he had received as an inheritance. He stated in the authorization papers that his investment objectives were "growth" and "speculative."

Beginning almost immediately Leib, with the assistance of Kulhavi, embarked on a course of very active trading. Typically Kulhavi would suggest securities for purchase from the lists produced by the Merrill Lynch research department. The men would discuss the price of the suggested stock, the nature of the corporation involved, the type of product or service produced by the corporation and the prognosis of the stock in terms of long or short term profitability. Leib stated that Kulhavi answered all questions satisfactorily and never purchased or sold any stock without prior authorization.

Merrill Lynch sent Leib confirmation slips and monthly statements on the status of his account. Leib read these slips and statements and, by his own admission, understood their contents. He stated that if he did have a question regarding the information in these papers he asked Kulhavi, who provided an explanation for him.

Although Kulhavi and Leib disagree as to which of them initiated most of the phone calls, they do agree that they conferred with each other over the phone usually four or five times a day and occasionally six or seven times a day. Leib personally visited the Merrill Lynch office upon occasion where he spoke to Kulhavi regarding investments, read *The Wall Street Journal* or studied the ticker-tape. From December 1971 to approximately June 1972 the Leib account realized modest profits.

In May 1972 Leib accepted a position with the National Bank of Detroit. Since his duties included some work with securities he had to consider the bank's policy of disallowing any employee dealing with securities to have his own margin account in stocks. In June 1972 Leib transferred his account with Merrill Lynch to the name of his brother Joel, as trustee. All parties agreed that Leib would remain in full control of the account in the same manner as before the transfer. Joel Leib executed a power of attorney in his brother Sheldon for that purpose.

Trading in the account continued as it had before the transfer. However, at about

this time the account began losing money. Additional sales had to be made to meet the more and more frequent margin calls since Leib steadfastly refused to invest more capital in the account to meet these calls. The relationship between Leib and Kulhavi deteriorated, Kulhavi complaining that Leib refused to take his advice and Leib complaining that Kulhavi's advice was unsound. Eventually the equity in the Leib account dwindled to virtually nothing. In April 1973 Leib directed Kulhavi to "sell him out." Within a few days the account was closed.

From December 1971 to April 1973—the life of his margin account—Leib purchased $298,507.32 in securities; he paid $8,318.35 in broker commissions and $1,807.35 in interest charges. The account turned over 9.95 times. Turnover is defined as the ratio of total cost of the purchases made for the account during a given period of time to the amount invested.

According to plaintiff, this pattern of trading is, by definition, not profitable for the customer and benefits only the broker. Plaintiff claims that Kulhavi breached his fiduciary duty and churned the account by allowing Leib to pursue this unprofitable pattern of trading. Specifically, it is contended that Kulhavi breached his fiduciary duty (1) by not informing Leib that the course of trading was unprofitable and (2) by excessively trading in the account for the sole purpose of generating commissions for himself. For the reasons discussed in Part II, above, if plaintiff is to prevail in his claim under any theory he must first prove that Kulhavi controlled the account.

IV. CONCLUSIONS OF LAW

■ The parties have stipulated that the Leib account was established as a non-discretionary account. I note from the papers that plaintiff makes no claim that Kulhavi violated any of the limited, transactional duties owed to him as a holder of a non-discretionary account. Furthermore, after considering all the evidence presented at trial I must conclude that plaintiff has not sustained his burden of proving that Kulhavi in fact usurped control of the account.

Leib is a man with professional experience in managing the financial affairs of others. He understood the dynamics of the stock market at the time he opened the account with Merrill Lynch and he appreciated the risks of trading on margin. From his college courses and from practical experience, he knew how to handle a securities account. When he dealt with the broker at Manley, Bennett, McDonald & Co., Leib retained full control over the account, relying upon the advice of friends or relatives in making purchases and sales. The relationship between Kulhavi and Leib was strictly professional. The frequent conversations between the two allowed Leib to keep tabs on the account on a daily basis—often on an hourly basis. No transactions occurred without Leib's personal approval after he had discussed the matter thoroughly with Kulhavi. Leib also kept himself informed on each transaction after it had occurred. Upon receiving confirmation slips and monthly statements Leib read them and either understood their contents or asked his broker for an explanation.

The fact that virtually all of the stocks purchased by Leib were recommended by Kulhavi does not demonstrate that Kulhavi controlled the account. A customer normally depends upon his broker to supply information, advice and recommendations. In accepting these recommendations Leib acted independently and voluntarily. In every case the final decision to buy, sell, or hold was his alone.

Under the circumstances Kulhavi, as broker, owed Leib only those limited, transactional duties discussed in Part II. He was not obligated to inform Leib that his pattern of trading heavily, taking profits, and holding losses was almost too risky to be profitable. Cf. Hecht v. Harris, supra. Nor was he obligated to point out the disparate amount paid in commissions as compared with the amount realized in profits. Cf. Stevens v. Abbott, Proctor and Paine, supra. In addition Kulhavi had no duty to restrain Leib from trading heavily. Since Leib controlled the account, the pattern of

trading, even if excessive, was Leib's sole responsibility. That this pattern generated substantial commissions for his broker is irrelevant under the circumstances of this case.

■ This analysis not only disposes of plaintiff's claim of breach of fiduciary duty, it also disposes of the traditional claim of churning. The law is clear that if a customer controls his own securities account he cannot prevail against his broker under a theory of churning, even where he can prove that the account suffered an excessive number of trades.

For the reasons discussed above a judgment of no cause of action is entered for the defendants against the plaintiff.