**In re Peter Wister REA, Debtor.**

**Christopher and April McCoun, Plaintiffs,**

**v.**

**Peter Wister Rea, Defendant.**

**Bankruptcy No. 99–32142–SAF–7.**
**Adversary No. 99–3327.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Feb. 7, 2000.

John T. Palter, Novakov Davis, P.C., Dallas, Counsel for Plaintiffs.

Wm. Chris Wolffarth, Johnson & Wolffarth, L.L.P., Dallas, Counsel for Defendant.

### MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

Peter W. Rea, the debtor, traded stocks for Christopher and April McCoun. Between July 7, 1998, and July 31, 1998, Rea lost $69,340.00 of the $100,000.00 that the McCouns gave him for day trading. In this adversary proceeding, the McCouns object to the discharge of that loss under 11 U.S.C. §§ 523(a)(2) and (a)(4). The court tried this matter on December 10 and 13, 1999.

The determination of the dischargeability of debts under § 523 constitutes a core matter over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 157(b)(2)(I) and 1334. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

■ Having been in the securities business for 30 years, in 1998 Rea ventured into the practice of day trading of stocks. The National Association of Securities Dealers (NASD) defines day trading strategy as "[a]n overall trading strategy characterized by the regular transmission by a customer of intra-day orders to effect both purchase and sale transactions in the same security or securities." *See Testimony of Arthur Levitt, Chairman, United States Securities and Exchange Commission, Concerning Day Trading Before the Permanent Subcommittee on Investigations, United States Senate*, n. 25, p. 22 (Sept. 16, 1999)(quoting NASD proposed rule SR–NASD–99–41 submitted to the SEC on August 20, 1999)(page references are to typed transcript). Levitt explained to the Senate committee that the level of individual trading activity varied across a wide spectrum making it difficult to clearly define "day trading" or "day trader." Levitt testified:

On one end of the spectrum lie investors who trade occasionally—sometimes online—and hold their investments for the longer term. Moving along the spectrum, an increasing number of individuals use their on-line accounts both to invest longer term and to trade short term on momentum or small changes in the price of a stock. On the far end of the spectrum are so-called 'day traders,' who exclusively buy and sell stock rapidly throughout the day trying to make money on short-term market moves.

*Id.* at 3.

Rea structured his business at that far end of the spectrum. Mary L. Schapiro, the president of NASD Regulation, Inc., told the Senate committee on September

16, 1999, that day trading at that end of the spectrum referred to

a trading strategy where an individual buys and sells the same security in an attempt to profit from very small movements in the price of a security over a short period of time. Although the term [day trading] is commonly used to refer to aggressively buying and selling a group of securities in a single day . . . , there are varying degrees of day trading currently being employed. . . .

However, the term 'day trading,' as commonly used within the [securities] industry, generally refers to the trading activities of the 'professional day trader,' that is, an individual who conducts intra-day trading in a focused and consistent manner, with the primary goal of earning a living through the profits derived from this trading strategy. This form of day trading requires aggressive and frequent securities trading, and as a result, generally requires a significant amount of capital, a sophisticated understanding of securities markets and trading techniques, and a high risk tolerance. Day traders typically have a relationship with a brokerage firm that provides them with more direct access to markets, as well as access to real-time trading and related information."

*Testimony of Mary L. Schapiro, President of NASD Regulation, Inc., Concerning Day Trading Before the Permanent Subcommittee on Investigations, United States Senate*, p. 6–7 (Sept. 16, 1999)(page references are to typed transcript).

Rea held a securities brokers license. He affiliated with an entity in Dallas, Texas, known as 1–800–DAY–TRADE, which provided access to markets and to real-time trading, with on-site trading facilities. Rea paid 1–800–DAY–TRADE a fee for each transaction. He developed a strategy to day trade for investors with $100,000.00 to commit as capital.

Rea solicited investments from his dentist, Jimmy Miller, and Miller's dental hygienist, Robin Parrent. Parrent told Rea that she invested $100,000.00 with a day trader who assured her that he would stop trading should the value of her portfolio drop below $90,000.00, and who would split profits with her. Rea said he would do better. Parrent said Rea guaranteed $1,000.00 per month return on a $100,-000.00 investment, but Rea said he only represented that if he did not make a profit in one month, he would pay $1,000.00 the next month before he received a fee or a share of the profits. Miller had the impression that Rea had been doing quite well with his day trading. Miller referred Rea to Christopher McCoun, a fellow dentist and friend.

In June 1998 Rea contacted McCoun. Rea asked McCoun to invest $100,000.00 in day trading. Rea represented that he had experience in day trading, had traded several accounts and would personally trade and supervise McCoun's account.

McCoun had virtually no experience in the stock market. But he had accumulated $100,000.00 and sought a vehicle for investment and growth. Rea proposed to McCoun that Rea would accumulate daily profits and losses in McCoun's account and that they would split profits at the end of each month, on a fifty-fifty basis. In the event that the account lost money in a month, Rea proposed that McCoun would realize $1,000.00 from the next month's profits before they split the remaining profit. Profits would not be paid to Rea until previous losses had been recovered. Profits would be determined after payout of all associated commissions. McCoun understood Rea to be guaranteeing a return. Rea would not himself charge a commission, but rather looked to the profits of the venture with McCoun for compensation.

After their initial telephone conversation, McCoun met Rea at Rea's office. They discussed Rea's background. Rea explained that he had completed a course in day trading. McCoun asked Rea about his experience with other accounts. Rea

told McCoun that he had been trading three accounts averaging $750.00 profit per day. Rea claims that McCoun misunderstood his response. Rea asserts that he told McCoun that he had an objective of a $750.00 daily profit on average. In reality, Rea had been losing money on the other accounts.

McCoun and Rea discussed the philosophy of day trading. Rea explained the objective to buy and sell stock each day, with no holdings at the end of the day. McCoun testified that Rea assured him there would be no open positions at the end of each day. McCoun insisted that Rea provide daily reports showing the daily transactions. Rea agreed to provide those reports. Rea would fax a report to McCoun daily showing daily actual profits and losses and the current daily value of the account. Rea agreed that McCoun reasonably requested daily reports. Rea also agreed that the account could be liquidated at any time.

Rea showed McCoun his operations, including computers, and introduced McCoun to his son, Robert. McCoun understood that Rea would be personally trading and supervising the account. McCoun also understood that Robert would assist Rea. Rea did not tell McCoun that Robert would be doing the actual trades nor that Robert had previously sustained losses trading another Rea account. Rea testified that he did inform McCoun about Robert's actual role, but McCoun's testimony to the contrary is credible. Rea had the experience. Rea solicited the business. Rea would hold the funds and provide the accounting. Rea described the strategy and relationship. Robert did not hold a license to trade securities. All factors in the conversation support McCoun's understanding of how Rea portrayed Robert's role.

McCoun had no desire to put his $100,-000.00 savings at risk. McCoun testified that Rea assured McCoun that he could minimize the risk by utilizing stop loss sales instructions should the portfolio val-ue fall by 10%. Rea testified that he never told McCoun that he would limit losses. Rea does not recall discussing stop loss projections with Miller and Parrent, but Parrent's testimony supports McCoun's testimony. With McCoun's lack of securities trading experience and his desire to protect his savings in any investments, McCoun's testimony is credible. Rea testified that a stop loss protection mechanism would not be typical for a traditional stock broker practice. But Rea recognizes that day trading is atypical; it is not traditional broker services. *See* Levitt Testimony. The court finds that Rea included a representation of stop loss protection mechanisms in his solicitation of the McCouns' $100,000.00. With the belief that Rea could implement this stop loss protection, that Rea had been realizing profits of $750.00 per day per $100,000.00 account, and that he would receive daily reports, McCoun and his wife agreed to the investment.

On June 28 and June 29, 1998, the McCouns executed several written agreements including a trading authorization for Rea that provided in part that Rea could not withdraw from their account cash or securities. McCoun completed a new account questionnaire checking his investment objective as "short term growth with high risk." He signed a form customer letter of understanding stating "[I] understand that active day trading is highly speculative. The capital in my trading account is capital not needed by me for my necessary expenses and is capital which I can afford to lose in its entirety." The written agreements do not include provisions for sharing the profits or other compensation terms, do not provide for the daily reports, and do not include instructions to stop trading should the value of the portfolio drop 10% from the initial investment. McCoun testified that he requested written agreements including those terms on several occasions but Rea never drafted nor submitted them. The form customer letter of understanding pro-

vides that "as a general policy positions should be flat by the close of each business day." McCoun understood by that provision Rea would not hold open accounts at the end of a day.

On June 29, 1998, McCoun provided Rea $100,000.00. Rather than trade himself, Rea turned the funds over to his son, Robert, who did the trading. While Robert handled the McCouns' trading, Rea traded his own account, funded by his wife's retirement funds. Rea testified that he used that account for experimentation and training. While Robert traded the McCouns' account, Rea lost $166,000.00 on his own account.

Each day 1–800–DAY–TRADE provided Rea with reports of the previous day's transactions. The confirmation reports reflected open positions at the end of each day. Rea did not question the accuracy of those reports. Robert prepared the daily report for McCoun and faxed the report to McCoun. Rea did not review the report prepared by Robert nor did Rea verify Robert's report with the 1–800–DAY–TRADE statements. The daily reports faxed to McCoun listed the stock purchase, the number of shares, the purchase price and the sales price. The report then reflected whether the transactions resulted in a gain or loss for each stock, with a daily total gain or loss and the portfolio value. None of the daily reports reflected stock positions still held at the end of a day. The report dated July 31, 1998, reflected an account value of $107,488.59, suggesting profit in the first month of $7,488.00. The daily reports were false.

Robert kept open positions on days when particular holdings had a loss. The daily reports faxed to McCoun did not reflect these open positions and consequently did not reveal the losses. The daily reports falsely stated the current value of the account. By the end of the month, McCoun's account had lost $69,-340.00. At trial, Rea conceded that he was responsible to the McCouns for timely and accurate daily trade reports. Rea conceded that he failed to perform in accordance with that responsibility. Rea recognized that he neglected the McCouns' account and failed to supervise and instruct Robert during this period. He also testified that a brokerage business had to be based on trust between the customer and the broker. He recognized that the trust relationship applied to his role as a day trader with the McCouns' money.

Rea recognized the situation at the end of July 1998. Rea and McCoun set a meeting for August 7, 1998. McCoun expected to receive his half of the $7,488.00 profit. Instead, Rea told him that he had lost about $69,000.00. On Rea's advice, McCoun directed Rea to sell his outstanding holdings, which Rea did. After applying the proceeds, the parties agree that the McCouns lost $69,340.00.

Rea offered to invest $20,000.00 into the McCouns' account and attempt to regrow the account. Later, Rea offered to purchase life insurance on Rea's life. Rea admitted liability and agreed to pay the McCouns back in full. But Rea soon learned that his other accounts had the same problem. He revised his settlement offer to have his accounts share in a fund. Ultimately Rea filed his petition for relief under Chapter 7 of the Bankruptcy Code. With the filing of the bankruptcy petition, Rea has forfeited his securities license. He now works as a salesman with hourly wages. He has not talked to Robert for 18 months.

Rea agrees that he owes the McCouns $69,340.00, the difference between the value of the holdings liquidated in early August 1998 and the $100,000.00 investment. The McCouns contend that the debt must be excepted from Rea's discharge under § 523(a)(2)(A) and (a)(4).

### Section 523 (a)(2)(A)

■ Exceptions to discharge should be construed in favor of debtors since the Bankruptcy Code provides a fresh start to debtors unhampered by pre-existing finan-

cial burdens. *In re Davis,* 194 F.3d 570, 574 (5th Cir.1999). But the Code does not create a haven for wrongdoers. Rather the Code gives the "honest but unfortunate debtor who surrenders his [non-exempt] property a new opportunity in life unhampered by pre-existing debt." *Id.* The creditor objecting to the discharge of a debt has the burden of establishing the exception by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■■■ Under § 523(a)(2)(A), the court may not discharge a debt for money obtained by false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's financial condition. Fraud may include fraud in the inducement and actual fraud in the transaction. To except a debt under this section, the McCouns must establish by a preponderance of the evidence that, either in the inducement or in the actual transaction, Rea made false representations, with the intent and purpose of deceiving the McCouns, and that the McCouns justifiably relied on the representations, and that they sustained a loss as a result of the representations. *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1292 (5th Cir. 1995); *In re Allison,* 960 F.2d 481, 484–85 (5th Cir.1992)(reliance must be justified); *In re Smith,* 113 B.R. 297, 304 (Bankr. N.D.Tex.1990).

The McCouns contend that Rea fraudulently induced them into making the $100,-000.00 investment. They contend that Rea falsely represented that he was successfully trading four accounts of $100,000.00 each, realizing $750.00 per day average profits. They contend that Rea guaranteed a $1,000.00 per month return and that he would minimize risk with a 10% stop loss protection.

Rea did solicit the McCouns' business. He induced them to make their investment, by falsely representing that his experience with other accounts had been profitable. The court also finds that Rea represented that he could minimize risk with a 10% stop loss protection. Without that protection, the McCouns would not have made the investment.

The McCouns lacked stock market experience. They agreed to the investment with the understanding that they would be exposed to no more than a $10,000.00 loss in the first month. They also knew that they would receive daily statements reflecting their precise positions at the end of each day. The McCouns thereby could terminate their investments should the risks be too great or should profits not be realized.

But the court does not find that Rea guaranteed a monthly return. Rea had substantial experience in securities trading. He knew he could not guarantee a return. Indeed he had the McCouns sign a written statement acknowledging the high risk in day trading and recognizing that they did not need the invested funds for sustenance. The McCouns confused Rea's proposal that the McCouns receive the first $1,000.00 of profits in a month following a loss with a guarantee of $1,000.00 per month.

The court further finds that Rea provided the McCouns with goals and objectives, including that holdings would be flat each day and that he sought a $750.00 daily profit on a $100,000.00 portfolio. Yet, he falsely represented his success with other accounts. And, by omission, he failed to inform the McCouns that his son, and not he, would actually be doing the daily trades. Robert had previously traded accounts for Rea but had failed to sell accounts by the end of each day.

Rea made false representations to induce the McCouns to invest $100,000.00 with him. He falsely represented that he had been profitably managing accounts and that he would minimize risks with stop loss protections. He falsely represented that he would trade the McCouns' money with his experience when he intended that his son would do the trading. He did not, however, represent that he guaranteed the

McCouns a profit. Rather, he represented his objectives and agreed that in the event a profit had not been realized in any one month, the McCouns would recover the first $1,000.00 of profits the following month. The McCouns acknowledged in writing that they were making high risk investments.

The McCouns justifiably relied on all of Rea's representations, including the false ones. But for those representations, the McCouns would not have made their investment and thus would not have lost the $69,340.00.

Beyond the inducement problems, Rea agreed to provide accurate daily reports showing the actual results of all transactions. Rea provided that report. But the reports were false. They did not show open positions. The open positions represented paper losses. Had the open positions been included, the McCouns would have seen that they were losing money throughout the month.

Rea blames his son for the false daily reports. But Rea had the agreement with the McCouns. Rea was responsible for the account. As the compliance officer for 1–800–DAY–TRADE testified, Rea personally received actual daily reports from 1–800–DAY–TRADE showing all activities from the previous day, including open accounts. Rea had the obligation to supervise his son. Rea had the duty to verify the accuracy of the reports sent to the McCouns, which he could have done from the 1–800–DAY–TRADE reports, even with Robert doing the actual trading. Rea knew or was recklessly indifferent that the reports sent to the McCouns were false. The court may infer an intent to deceive from Rea's actual knowledge of the daily positions and the false reports or his reckless indifference to the accuracy of the reports. *In re Samani*, 192 B.R. 877, 880 (Bankr.S.D.Tex.1996).

The daily reports sent to the McCouns constitute false representations. Rea allowed Robert to send the reports with the intent that the McCouns believe that positions were flat each day, with profits growing during the month. Both were false. Rea intended to deceive the McCouns. The McCouns justifiably relied on the reports, believing that Rea was performing according to his stated objectives and that they were making money. But they were not. But for the false reports, the McCouns would have stopped trading once they suffered a 10% loss. As a result of the representation, they suffered losses of $69,340.00.

■ The McCouns have established by a preponderance of the evidence that Rea obtained money initially and daily during the month of the transaction by false representations. Rea concedes he is liable for the McCouns' loss of $69,340.00. Accordingly, under § 523(a)(2)(A), that debt is excepted from Rea's discharge.

Rea contends, nevertheless, that he did not "obtain" money. Section 523(a)(2)(A) excepts from discharge a debt for money "obtained by" false pretenses, a false representation or actual fraud. The McCouns retained legal and equitable title to their $100,000.00 or the securities purchased by Rea from that fund. The McCouns did not pay Rea a commission; the only commissions being paid went to 1–800–DAY–TRADE. The venture never resulted in a profit to share.

■ Courts have split on whether the debtor must actually receive the money or derive a benefit from the money. *See In re Naimo*, 175 B.R. 878, 880–881 (Bankr.E.D.Pa.1994)(listing the cases with the competing reading of the provision). This court agrees with the courts that hold the term "obtained by" limits nondischargeable debts for money to fraud instances as opposed to money obtained by honest means. *In re Mones*, 169 B.R. 246, 252 (Bankr.D.Dist.Colo.1994). The statute does not otherwise require or address for whose benefit the debtor obtained the money.

But, in any event, Webster's Third New International Dictionary Unabridged (1986) defines "obtain" as "to gain or attain possession or disposal of usually by some planned action or method." Rea gained possession of the McCouns' money by their planned agreement. Rea accordingly obtained money. Rea had the daily use of the money to invest with the opportunity to profit pursuant to his agreement with the McCouns. Accordingly, Rea derived benefit.

The case presents an unusual set of circumstances. Rea and his son bought securities with the McCouns' money. The McCouns owned the securities. When Rea informed the McCouns of the loss of value of their investments, the McCouns nevertheless owned the equity positions. After learning that Rea had misrepresented that he would minimize their risk with a 10% stop loss protection, would trade their accounts himself and would provide accurate daily reports, they nevertheless accepted Rea's advice to immediately liquidate their holdings. The court would have expected under these circumstances that the McCouns would have sought the advice of security houses before deciding to liquidate their holdings. Ironically, had the McCouns held their holdings until the day of trial, as best as the court can determine from daily stock quotes, their $100,000.00 investment portfolio would have been worth at least $271,083.00 on December 10, 1999, and at least $350,876.00 on January 31, 2000 (the court could not obtain a value for two companies). But that highlights the risks with and inadvisability of day trading.

### Section 523(a)(4)

The McCouns next contend that Rea committed the fraud or an act of defalcation while acting in a fiduciary capacity thereby excepting the debt from discharge under 11 U.S.C. § 523(a)(4). To show non-dischargeability under § 523(a)(4), a creditor must prove by a preponderance of the evidence that (1) the debt was caused by fraud or defalcation, and (2) there was a fiduciary relationship between the parties at the time the debt was created. *In re Chavez*, 140 B.R. 413, 422 (Bankr.W.D.Tex.1992).

A fiduciary under § 523(a)(4) does not refer to any relationship involving confidence, trust or good faith, rather § 523(a)(4) concerns a relationship arising out of a technical or express trust. *In re Tran*, 151 F.3d 339, 342 (5th Cir.1998); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934). An express trust traditionally includes (1) an explicit declaration of a trust, (2) a defined trust *res*, and (3) an intent to create a trust relationship. *Chavez*, 140 B.R. at 423. To create an express trust, the legal and equitable title to the trust *res* must be separate, the former being vested in a trustee and the latter in a beneficiary. But the express trust may be created by an express agreement, the direct acts of the parties or a written instrument. *In re Berry*, 174 B.R. 449, 454 (Bankr.N.D.Tex. 1994). A technical trust, on the other hand, may be imposed by law. *In re Angelle*, 610 F.2d 1335, 1341 (5th Cir.1980). The trust must exist before the transactions that give rise to the claim. *Id.*

Rea and the McCouns operated like a joint venture. The McCouns provided the capital for the investments, but vested full discretion in Rea on the daily investment decisions, provided that he not permit their losses to exceed 10%. Rea managed the capital. Rea bought and sold securities in the McCouns' name and on their behalf. Rea maintained the McCouns' funds in a segregated account and provided a daily accounting to the McCouns. At month's end, if Rea achieved a profit, he and the McCouns would share the profit equally. If he did not receive a profit, the McCouns would receive the first $1,000.00 of profit from the next profitable month before the parties shared the remaining profits. The McCouns had virtually no experience in securities trading. They relied on and deferred to Rea's experience.

Rea recognized that he and the McCouns had a relationship based on trust.

■■■■ Texas common law recognizes that a fiduciary relationship may arise from moral, social, domestic or purely personal relationships of trust and confidence. 41 TX Jur.3d Fraud and Deceit § 6 (1988). But the test for § 523(a)(4) does not turn on whether Texas law would recognize a fiduciary relationship for equitable reasons but rather whether Texas law would recognize a fiduciary relationship based on an express or technical trust. Here, the parties had a relationship of trust and confidence. Indeed, they stood as principal and agent or as parties in a venture. By their acts, they established that relationship. But, the *res*, the McCouns' $100,000.00 and the equities it bought, remained at all times in the McCouns' name. The McCouns retained both legal and equitable title. Consequently, Texas law would not recognize an express trust.

■■■■ The law may, nevertheless, impose a technical trust on the relationship. For example, a managing partner in a Texas partnership owes a fiduciary duty imposed by law to his partners. *See In re Bennett*, 989 F.2d 779 (5th Cir.1993); *Huffington v. Upchurch*, 532 S.W.2d 576 (Tex.1976). A director of a corporation owes a fiduciary duty to the corporation's shareholders. *Dunagan v. Bushey*, 152 Tex. 630, 263 S.W.2d 148, 152 (1953). A statute may impose a technical trust on a relationship providing it includes a *res* and trust-like duties. *Tran*, 151 F.3d at 342–43.

■■■■ Even though not performing traditional broker strategies, Rea acted as a securities broker as defined by the Securities and Exchange Act, 15 U.S.C. § 78c(a)(4), which defines a broker as an individual who is "engaged in the business of effecting transactions in securities for the account of others." Rea engaged in effecting daily transactions in securities for the McCouns' account.

Rea effected securities transactions for the McCouns with total discretion, using a defined *res*, provided he stopped trading if he experienced a 10% loss. Title to the securities bought and sold by Rea remained in the customer, the McCouns.

Rea contends that he should not be viewed as a broker, observing that he had not been paid by commission. Rea's activities fall squarely within the securities' law definition of a broker. As Chairman Levitt testified before the Senate committee, day trading differs from traditional broker strategies, but the difference amounts only to strategy, not to the parties' legal relationship.

■■■■ The broker, by virtue of his position, owes a fiduciary duty to his customer. *Armstrong v. McAlpin*, 461 F.Supp. 622 (S.D.N.Y.1978); *People v. Mercer Hicks Corp.*, 4 Misc.2d 55, 155 N.Y.S.2d 740, 744 (1956), aff'd 3 A.D.2d 708, 160 N.Y.S.2d 806 (1st Dept.1957); 11 N.Y. Jur. Brokers § 74 (1996). Although some jurisdictions do not recognize a fiduciary duty for brokers who merely execute a customer's orders without any discretion on the broker's part, *In re Oberweis Securities, Inc.*, 1992 WL 119272 (Bankr. N.D.Ill.1992), when the broker has the discretion to determine which purchases and sales to make and when, the law imposes a fiduciary duty on the broker. *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951, 953 (E.D.Mich.1978); *Commodity Futures Trading Commission v. Heritage Capital Advisory Services, Ltd.*, 823 F.2d 171, 173 (7th Cir.1987). "Unlike the broker who handles a non-discretionary account, the broker handling a discretionary account becomes the fiduciary of his customer in a broad sense." *Leib*, 461 F.Supp. at 953. The court has not found any Texas authority addressing the issue; but the court cannot discern any teaching from the Texas courts that would not follow this precedent.

Rea relies on *In re Michel*, 74 B.R. 80 (Bankr.N.D.Ohio 1985), and *In re Buhay*, 77 B.R. 561 (Bankr.W.D.Tex.1987), for the

proposition that a broker is not a fiduciary under an express or technical trust existing prior to the transaction from which the debt arises. Both cases, however, recognize that a securities broker may hold money for an investor in trust. Both courts found that the creditor failed to meet its burden of proof. Although here the McCouns failed to establish an express trust because they retained legal and equitable title to the *res,* the law imposes a technical trust on their relationship with Rea. They have met their burden of proof by establishing a *res* and trust-like duties. The McCouns transferred the $100,000.00 to Rea before Rea began trading. The transactions that give rise to the debt occurred in the daily trading after the establishment of the technical trust relationship.

The case law does not expressly address the fiduciary capacity of day traders. Since Rea acted as a broker over a discretionary account, the law would impose a fiduciary relationship without the need to explore the day trading practice.

Marketplace developments concerning day trading support that result. Chairman Levitt testified before the Senate Committee that recent technological advances fostered the development of day trading. While the SEC does not believe that day trading currently presents systemic problems for the securities markets, Levitt testified about the potential for individuals to be seduced by promises of easy profits by day trading without fully understanding the risks. Day trading involves significant risks of loss. Levitt observed: "While technology provides innumerable benefits to investors by making trading easier and faster, new and relatively inexperienced investors may be using this technology to trade in ways that do not match their goals and risk tolerance." Levitt Testimony at 6. The NASD has concluded that day trading brokers must disclose the "unique risks" posed by day trading and have reasonable grounds for believing that a day trading strategy is appropriate for the customer. The NASD

has promulgated a rule to that effect, which has been submitted to the SEC for consideration. *See* SR–NASD–99–41 (August 20, 1999). Chairman Levitt explains that the rule would require firms that promote day trading activities to disclose to customers, prior to opening accounts, the risks associated with that type of trading. The customer must be prepared to lose all of the funds used for day trading. The rule would also require day trading firms to make a threshold determination that day trading is appropriate for the particular customer. A day trading firm, in approving an account for day trading, would need reasonable grounds for believing that a day trading strategy is appropriate for the customer by gathering essential facts about the customer. SR–NASD–99–41 (August 20, 1999).

This recent rule-making responds to the unique risks generated by the technological innovation that makes day trading possible. If anything, those risks strengthen the public policy reasons for the common law's imposition of a technical trust on brokers. The court, therefore, concludes that the law imposes a trust on Rea acting as a securities broker for the McCouns. Rea was "acting in a fiduciary capacity."

The court has already found that Rea actively misrepresented and that the McCouns justifiably relied on the misrepresentations in allowing Rea to invest the money throughout their one month's relationship. Rea has therefore incurred a debt for fraud while acting in the fiduciary capacity.

 Under §.523(a)(4), a defalcation is a willful neglect of a fiduciary duty even if not accompanied by fraud or embezzlement. *Matter of Moreno,* 892 F.2d 417, 421 (5th Cir.1990). For a broker generally, the fiduciary obligation imposes a duty to recommend securities suitable for the customer. The broker has a duty to provide the customer with all information relevant to the affairs the customer instructed to the broker. When the broker's services include providing investment ad-

vice, the broker has the duty of making recommendations in the best interest of the customer. The broker must execute orders fairly, with a duty to disclose markups and markdowns and other pricing events. Dan Brecher and Jeffrey S. Rosen, *Securities Arbitration of Customer Claims Alleging Unsuitability, Improper Markups/Markdowns or Breach of Fiduciary Duties,* 950 PLI/Corp. 469, 473, 494–95 (1996). The broker has a duty to segregate the customer's funds, including proceeds of sales and to provide an accounting to the customer. *Mercer Hicks,* 155 N.Y.S.2d at 744. For brokers handling discretionary accounts, while not needing prior authorization for each transaction, the broker has a duty to manage the account in a manner directly comporting with the needs and objectives of the customer as stated in the authorization papers or as apparent from the customer's investment and trading history; to keep informed regarding the changes in the market which affect his customer's interest and act responsively to protect those interests; to keep his customer informed as to each completed transaction; and to explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged. *Leib,* 461 F.Supp. at 953.

 Rea did not provide accurate daily accountings of transactions to the McCouns. Indeed, he provided false and misleading accountings of transactions. Rea did not keep the McCouns informed as to all completed transactions. Rea did not disclose that their partnership-like profit sharing agreement did not comport with the traditional manner of payment by commission under the securities regulations. Rea did not manage the account based on the articulated needs and objectives of the McCouns, since he did not liquidate the holdings nor stop trading when the value of the equities ended a day below $90,000.00. Rea did not explain the practical impact and potential risks to the McCouns even though he had them ac-

knowledge risks. The court finds that Rea committed acts of defalcation while acting in a fiduciary capacity. He committed these acts after the trust had been imposed on June 29, 1998.

The McCouns have established by a preponderance of the evidence that Rea's debt to the McCouns must be excepted from his discharge under § 523(a)(4).

The McCouns move the court for leave to file a second supplemental trial brief. The brief discusses violations of NASD rules of conduct and the Texas Securities Act. Although an analysis of these matters may have been informative, the parties did not try this adversary proceeding based on state or federal securities laws and regulations. Except for the definitions of brokers and day trading and the regulatory developments concerning day trading, the court has not considered whether any securities laws or regulations have been violated by the parties' course of dealing. The motion is denied.

### Attorney's Fees

 The McCouns contend they should recover their attorney's fees for prosecuting this matter. The McCouns may recover reasonable attorney's fees necessary to establish their claim, to the extent authorized by non-bankruptcy law. *In re Jordan,* 927 F.2d 221, 226–228 (5th Cir.1991). However, Rea conceded that debt, including the damages. Consequently, this litigation concerned only the dischargeability of that debt. The Bankruptcy Code does not provide for the recovery of attorney's fees for dischargeability litigation. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 249–50, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)(absent specific fee-shifting statutory or contractual authorization, each side bears its attorney's fees under the so-called "America Rule"). The McCouns may not recover their attorney's fees for prosecuting this adversary proceeding.

## Conclusion

A court must adjudicate disputes not settled by the parties. But this case continues to compel a pragmatic resolution by the McCouns and Rea. The McCouns claimed risk aversion yet they agreed in writing to the riskiness of the investments. They relied on Rea's representation they could cut their losses at $10,000.00. The McCouns do not contend that Rea willfully and maliciously injured them. Indeed, had they held their equity positions long term, they could have netted an impressive return. Meanwhile, Rea has appropriately lost his securities license. He struggles on an hourly wage while his wife has returned to the work force after retirement. Neither Rea nor his wife have spoken to Robert since August 1998.

## Order

Based on the foregoing,

**IT IS ORDERED** that Christopher and April McCoun have a judgment against Peter Wister Rea declaring the debt of $69,340.00 not discharged under § 523(a)(2)(A) and (a)(4). Counsel for the McCouns shall prepare a final judgment consistent with this order.