TRUMBALL INVESTMENTS LIMITED I; Trumball Investments Limited II; Molina International Limited; Ivywild Investment Corporation; Cortland Overseas Limited; Terrel Overseas, Incorporated, Plaintiffs–Appellants,

v.

WACHOVIA BANK, N.A., formerly known as First Union National Bank, Defendant–Appellee.

No. 05–1536.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 30, 2005.

Decided Feb. 3, 2006.

444

**ARGUED:** Donald James Enright, Finkelstein, Thompson & Loughran, Washington, D.C., for Appellants. Mary Catherine Zinsner, Troutman Sanders, L.L.P., McLean, Virginia, for Appellee. **ON BRIEF:** Jonathan P. Lienhard, Troutman Sanders, L.L.P., McLean, Virginia, for Appellee.

Before WILKINSON, KING, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge KING and Judge SHEDD joined.

## OPINION

WILKINSON, Circuit Judge.

A discretionary investment account, in which an investor permits a broker to engage in trades without prior authorization, can be advantageous because it allows the broker the freedom to exercise his expertise on the investor's behalf in accordance with the investor's stated objectives. In this case, the clients of a bank brought suit alleging that language in a discretionary investment contract compelled the bank to follow certain oral investment instructions and that it failed to do so. The district court dismissed the suit. We affirm, because the parties failed to manifest an intention to tie the bank's hands in an agreement whose very purpose was to confer discretion on the bank to make investment decisions.

### I.

Plaintiffs are a group of six corporations, Trumball Investments Limited I, Trumball Investments Limited II, Molina International Limited, Ivywild Investment Corporation, Cortland Overseas Limited, and Terrel Overseas, Incorporated. Plaintiffs contracted with First Union National Bank ("First Union"), the predecessor in interest of defendant Wachovia Bank, N.A. Each of the plaintiffs maintained an investment account with First Union, which was entrusted with managing the accounts.

A similarly worded agreement governed each account. First Union was required to

follow the instructions in the agreement and "such other instructions as may from time to time be furnished in writing." The relevant instructions in the original agreement provided as follows:

1. You [First Union] are to provide investment review and management of the Account, taking such actions as you, in your discretion, deem best with respect to the investment and reinvestment of the property held therein as though you were the owner of such property.

. . .

8. You [First Union] may in your discretion, follow and rely on any instructions given orally, by telephone, telegraph, cable or radio that you believe to be genuine. You shall endeavor to obtain written confirmation of such instructions.

The parties drafted an Addendum to the agreement. The applicable provision of the Addendum provided:

B. It is agreed that Paragraph 8 . . . shall be modified to annex the additional language: It is agreed that First Union National Bank of Virginia ("Agent") shall in its discretion, follow and rely on any instruction given by Humayun H. Baigmohamed, given via facsimile transmission, or given orally, by telephone, that Agent believes to be genuine. Agent shall endeavor to obtain written confirmation of such instructions.

Both the agreement and the Addendum were executed on June 8, 1998.

On approximately April 4, 2000, Humayun Baigmohamed, an authorized agent of plaintiffs, met with Jim Lu, a First Union employee, at First Union's Virginia offices. Baigmohamed instructed Lu to liquidate all the securities in the accounts because the federal funds interest rate had risen. He further told Lu that First Union should invest the proceeds of these sales in United States Treasury issues. Plaintiffs have not indicated that Baigmohamed ever provided this instruction in writing.

First Union did not carry out Baigmohamed's request to sell the securities. Plaintiffs did not notice this discrepancy until Baigmohamed received the April account statements on May 10, 2000. In the interim, the accounts decreased in value by $1,626,889.

On January 11, 2005, plaintiffs brought suit in the Eastern District of Virginia on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(2) (2000). They alleged that First Union breached its contract with plaintiffs when it failed to follow Baigmohamed's oral instructions to sell the securities and buy United States Treasury issues. They sought as damages the decline in the value of the securities. First Union filed a motion to dismiss under Rule 12(b)(6), which the district court granted. Plaintiffs appeal.

## II.

At the outset, we note that this case involves investment accounts, of which there are two general types: non-discretionary and discretionary. A non-discretionary account requires the broker to obtain authorization before it makes any investment decisions. *See Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1128 (D.C.Cir.1990); *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 820 n. 3 (10th Cir.1986). A discretionary account, by contrast, allows an investment broker to make account transactions without the client's prior approval. *See Cheng*, 901 F.2d at 1128; *Hill*, 790 F.2d at 820 n. 3.

In return for this grant of discretion, a broker operating a discretionary account typically owes greater duties to his client than a broker who must receive

authorization for each transaction. *See, e.g., Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 940–41 (2d Cir.1998) (noting that typically a broker operating a discretionary account has a general fiduciary duty to his client whereas a broker operating a non-discretionary account has narrower obligations); *Hill,* 790 F.2d at 824 (same); *see also Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 953 (E.D.Mich.1978) (describing a broker operating a discretionary account as "the fiduciary of his customer in a broad sense"). Most notably, the broker managing a discretionary account has to make investment decisions that are faithful to the needs and objectives of his client. *Leib,* 461 F.Supp. at 953.

Investors may prefer a discretionary account because it has the potential to decrease the costs of transacting in financial markets. Many individuals do not have the knowledge required to efficiently manage their investments. For them, an experienced broker has a decided information advantage and can procure information relevant to an investment decision at lower cost. A discretionary account therefore allows experts to handle investment decisions with the result that less informed investors are not foreclosed from participating in complex markets. *See, e.g.,* Frank H. Easterbrook & Daniel R. Fischel, *Optimal Damages in Securities Cases,* 52 U. Chi. L.Rev. 611, 651 (1985) (noting that the purpose of giving a broker discretion is "to use the broker's comparative advantage"). While non-discretionary accounts also allow an investor to rely on a broker's recommendation and superior knowledge, discretionary accounts can be of greater utility because any decision will be made solely on the broker's first-hand knowledge and expertise.

In addition to informational advantages, discretionary trading accounts also hold forth the promise of reduced administrative costs, because brokers are not required to confer with clients prior to executing every transaction. Even some sophisticated investors, who presumably could manage their own accounts, simply may not have the time or inclination to carefully consider and authorize each transaction. Investment decisions can often require significant time, as brokers must explain the decision and clients must mull it over. And many investment opportunities have only a limited window; a broker might not be able to obtain a client's authorization before the opportunity expires. *See, e.g., Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 622 F.2d 216, 221 (6th Cir.1980) (noting that "[d]iscretionary accounts are more common for commodities where fast trading is required due to sharp movement in prices"), *aff'd,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Investors may thus see an advantage in delegating the oversight of these accounts to a broker who specializes in portfolio management and who has the necessary technology and personnel to conduct transactions rapidly and on a large scale.

The end result is that beneficial investments which might not otherwise take place—due to either information deficiencies or administrative costs—may now occur. *See also SEC v. Zandford,* 535 U.S. 813, 823, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (a discretionary account "enables individuals ... who lack the time, capacity, or know-how to supervise investment decisions, to delegate authority to a broker who will make decisions in their best interests without prior approval"). The costs of investing are reduced by allocating them to an agent who can bear them most cheaply. And since investments drive gen-

eral economic productivity and growth, providing a broker with discretion can enhance both individual and social welfare.

Plaintiffs do not dispute that their agreement with First Union created discretionary investment accounts. Nor could they. The agreement is captioned "Discretionary Account" and is replete with language explicitly underscoring First Union's discretionary powers. Paragraph 1, for example, specifies that First Union is "to provide investment review and management" of the accounts, to make investment decisions that it, in its discretion, deems best, and to handle the property in the accounts "as though [it] were the owner of such property." Furthermore, Paragraph 7 indicates that First Union is under no obligation to take any action other than that already specified with respect to any property in the accounts "unless specifically agreed to by [it] in writing." Thus, keeping in mind that First Union was vested with discretion in making investment decisions, we turn to the specific contractual provisions at issue.

### III.

■ Plaintiffs argue that the Addendum set forth a mandatory duty, and that First Union thus breached its obligations under the agreement when it did not follow Baigmohamed's oral instructions to liquidate all securities in the accounts. The Addendum provided that First Union "shall in its discretion, follow and rely on any instruction given by Humayun H. Baigmohamed, given via facsimile transmission, or given orally, by telephone." Under Virginia law, "when the terms of a contract are clear and unambiguous, a court is required to construe the terms according to their plain meaning." *Golding v. Floyd*, 261 Va. 190, 539 S.E.2d 735, 736 (2001). We disagree with plaintiffs' interpretation both because the plain language of the Addendum re-

quires otherwise, and because it runs counter to the undisputed discretionary nature of the agreement.

### A.

■ The Addendum unambiguously gives First Union discretion to follow Baigmohamed's investment instructions. Most importantly, the plain meaning of the phrase "shall in its discretion" allows First Union to use its expert judgment. *See The Random House Dictionary of the English Language* 563 (2d ed.1987) (defining discretion as "the power or right to decide or act according to one's own judgment; freedom of judgment or choice").

■ Plaintiffs are of course correct that "shall" typically is mandatory in nature. *See Ross v. Craw*, 231 Va. 206, 343 S.E.2d 312, 316 (1986) (noting that "shall" is "primarily mandatory in its effect" and "may" is "primarily permissive"). But courts must look to the context in which "shall" is used in ascertaining its meaning. *See id.* (citing *Pettus v. Hendricks*, 113 Va. 326, 74 S.E. 191, 193 (1912)). The word "shall" cannot be interpreted in a vacuum, as plaintiffs contend, and the words around it help elucidate the overall meaning of the clause. "Shall in its discretion" has an entirely different meaning than "shall" standing alone. Any other interpretation would treat "in its discretion" as mere surplusage, which courts are disinclined to do. *See, e.g., Richfood, Inc. v. Jennings*, 255 Va. 588, 499 S.E.2d 272, 276 (1998) ("No word or clause will be treated as meaningless if a reasonable meaning can be given to it.") (internal quotation marks omitted).

Moreover, other parts of the agreement utilize the word "shall" without the modifier "in its discretion," indicating that the parties knew how to draft a mandatory obligation. Paragraph 2, for example, pro-

vides that registered securities "shall be registered in [First Union's] nominee or nominees, or [its] name as Agent." Similarly, Paragraph 3 instructs that First Union "shall" dispose of any income from the accounts according to the plaintiffs' written directions. The fact that the parties tempered "shall" with "in its discretion" in the Addendum is telling evidence that they did not intend it to enact a mandatory duty.

Plaintiffs nonetheless contend that the only relevant distinction between the Addendum and Paragraph 8 is the use of the word "shall" instead of "may," and that interpreting the Addendum's language as permissive makes it superfluous. But there are other salient differences between the two clauses that do not require us to read out the Addendum's discretionary language. Most notably, Paragraph 8 does not detail precisely who will give the instructions. In contrast, the Addendum provides greater specificity—the instructions will be given by Baigmohamed. In addition, Paragraph 8 specifies that First Union may follow "instructions given orally, by telephone, telegraph, cable or radio." The Addendum, however, modifies this list to include instructions "given via facsimile transmission." Plaintiffs, therefore, have provided no persuasive reason to construe "shall in its discretion" contrary to its plain meaning.

### B.

Our interpretation of the contract also finds support in the undisputed nature of the agreement itself. *See Quadros & Assocs., P.C. v. City of Hampton*, 268 Va. 50, 597 S.E.2d 90, 93 (2004) ("We consider the contract as a whole and do not place emphasis on isolated terms."). These are, after all, discretionary accounts—in which the operating presumption in the parties' relationship is that an expert broker will make appropriate investments on behalf of and without prior authorization from its client. The accounts by definition give the broker substantial discretion to use its best judgment. Had the parties intended the Addendum to depart from this understanding and transform the entire nature of their relationship, we expect they would have done so in a less opaque manner. Otherwise, the potential gains the parties attempted to generate with their use of discretionary accounts would go for naught.

A contrary presumption would moreover place a broker in an untenable Catch–22. In this case, for example, First Union might have been subjected to litigation and potential liability whether or not it followed Baigmohamed's dramatic oral instructions to liquidate all the securities holdings and place the proceeds in Treasury issues. On the one hand is the present situation—First Union did not follow the instructions, the value of the securities in the accounts decreased, and First Union now confronts plaintiffs' action.

If, on the other hand, First Union had honored Baigmohamed's extraordinary oral request and the value of the released securities had subsequently increased, plaintiffs might still have filed suit. They could now contend that First Union failed to take appropriate care in not making further inquiry before embarking on the drastic step of liquidating all the securities in all the accounts and changing the entire nature of the investments from equity to fixed-income—a move potentially in conflict with plaintiffs' investment objectives. This is cause for real concern, since a broker operating a discretionary account generally owes greater duties to its client than a broker who must receive authorization for each transaction. *See, e.g., Indep. Order of Foresters*, 157 F.3d at 940–41; *Hill*, 790 F.2d at 824; *Leib*, 461 F.Supp. at

953. First Union would have no written proof to show that it did not take the extreme step itself, but merely followed Baigmohamed's liquidation instructions. This scenario is most likely the reason that other provisions in the agreement actually requiring First Union to follow plaintiffs' commands do so clearly and specify that plaintiffs will give the instructions in writing.*

## IV.

In sum, we are loath to limit First Union's discretion in managing the investment accounts absent some clear direction to the contrary. Since the parties did not provide any such language in their agreement, and instead unambiguously allowed First Union to use its discretion, the judgment of the district court is

*AFFIRMED.*

---

* The parties also dispute whether the exculpatory clause in Paragraph 7 of the agreement barred the suit. This paragraph provided in relevant part that First Union "shall be liable only for losses caused by gross negligent management or actual wrong-doing." Plaintiffs argue that this clause does not apply because First Union's failure to follow their express trading instructions represented gross negligence. First Union counters that plaintiffs did not allege gross negligence or actual wrong doing in their complaint and that, in any event, the challenged actions did not amount to gross negligence. Because of our disposition of the case, we do not reach this issue.